[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 03-13011

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 12, 2004
THOMAS K. KAHN
CLERK

D. C. Docket No. 02-80438-CV-DTKH

SHELDA HARRIS BANNON, as parent
and natural guardian of her daughters,
Sharah Harris and Brittni Harris,

                                                    Plaintiff-Appellant,

versus

SCHOOL DISTRICT OF PALM BEACH
COUNTY, a body corporate, ED HARRIS,
individually and in his capacity as principal
of Boca Raton Community High School,
JOE SABIA, individually and in his capacity
as Girl's Basketball Coach of Boca Raton
Community High School,

                                                    Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(October 12, 2004)**

Before BLACK, BARKETT and MAGILL[*], Circuit Judges.

PER CURIAM:

Appellant Shelda Harris Bannon, on behalf of her daughter Sharah Harris, alleged that Appellees, School District of Palm Beach County and Principal Ed Harris, violated Sharah's First Amendment rights by compelling her to remove religious words and symbols from murals painted for a school beautification project. The district court granted summary judgment for Appellees because it concluded (1) Appellees never created a public forum, (2) the murals were school-sponsored speech, and, (3) Appellees' response was reasonably related to legitimate pedagogical objectives. We affirm.

## I. BACKGROUND

This litigation concerns a school beautification project at a religiously diverse public school. While the school was undergoing long-term remodeling, students were prevented from walking into construction areas by dozens of large plywood panels in interior and exterior hallways. These panels were ugly, and would remain a part of the school for up to four years. To beautify the school, students were invited to paint murals on the panels. The school did not

---

[*] Honorable Frank J. Magill, United States Circuit Judge for the Eighth Circuit, sitting by designation.

2

specifically prohibit students from expressing religious views. The school did, however, instruct students that their artwork could not be profane or offensive to anyone.

Sharah, a high school senior and member of the Fellowship of Christian Athletes (FCA), decided to participate in this beautification project. Although Sharah and her FCA colleagues planned to use verbal messages and religious symbols, they never gave Principal Harris or Cathy Roberts (the teacher supervising the beautification project) any notification or advance warning. No other student murals had verbal messages. On a Saturday afternoon, Sharah and other FCA students painted several murals with various religious messages and symbols.

Three of these murals were most notable. Sharah's first mural was next to the school's main office, had a crucifix in the background, and paraphrased *John* 3:16 as "Because He ♥ed, He Gave." Sharah's second mural was only a few panels down from the office and read, "Jesus has time for you; do you have time for Him?" Sharah's FCA colleagues painted a third mural, located in a main hallway, that read, "God Loves You. What Part of Thou Shalt Not Didn't You Understand? God."[1]

---

[1] We refer to these three murals collectively as "Sharah's murals" or "the murals."

The following Monday morning, Principal Harris found a commotion on campus near Sharah's murals involving vocal students and teachers. Later that day, the murals received media attention in the form of phone calls, reporters from three television stations, and newspaper reporters. This publicity and controversy distracted the attention of students, teachers, and administrators from schoolwork, teaching, and administrative duties. As Principal Harris explained in his deposition, the expression in Sharah's murals interfered with the operation of the school,

> [b]ecause if it takes any time away from the productivity of the school in itself and the length of time that I had to spend on this, taking the principal's time, the assistant principal's time, the student's time away [from] the main focus of the school, . . . [so] the school was focusing more on the panels, overall, more so than [it] was focusing on the reason we were here.

Principal Harris did not expel, suspend, or otherwise punish Sharah for painting her murals. Instead, Principal Harris spoke about the murals with Ms. Roberts. Shortly thereafter, Ms. Roberts invited Sharah to step outside of class to speak privately. During this discussion, Ms. Roberts explained that although Sharah would need to paint over the overt religious words and sectarian symbols on all three murals, such as "Jesus," "God," and the crucifix, her other images and messages could remain. During her deposition, Sharah conceded this selective

4

deletion was an attempt to keep her happy. Sharah repainted her murals and the FCA murals after school. Notably, Sharah was not the only student whose mural was edited. Principal Harris directed the removal of profanity, gang symbols, and satanic images from students' murals.

Appellant filed suit,[2] but the district court granted summary judgment for Appellees on the First Amendment claims because it concluded Appellees did not create a public forum. Instead, the district court reasoned the beautification project fell "squarely in the category of school sponsored speech." Applying *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), which governs school-sponsored expression, the district court held Principal Harris's restrictions were "reasonably related to [the] legitimate pedagogical goal[s of] . . . . disassociating [the school] from religious organizations and the endorsement of religious views . . . . [and] avoiding disruption [to the learning environment] from religious debate on the walls of the school."[3] Appellant appealed.

---

[2] Appellant alleged claims on behalf of both her daughters, Sharah and Brittni. On behalf of Brittni, Appellant alleged a Title IX violation against Brittni's basketball coach. On behalf of Sharah, Appellant alleged violations of the First Amendment, as applicable to the states through the Fourteenth Amendment of the U.S. Constitution, via 42 U.S.C. § 1983, and the Florida Constitution's free exercise, free speech, and equal protection clauses. Appellant voluntarily dismissed her Title IX claims on behalf of Brittni, and does not argue on appeal that Appellees acted in violation of the Florida Constitution. Accordingly, our review is limited to the district court's denial of Appellant's First Amendment claims.

[3] *Hazelwood* involved a principal's decision to delete two articles from a high school newspaper, which was written and edited by a journalism class. 484 U.S. at 262-64. One article

## II. DISCUSSION

Appellant first contends the district court erred because it did not subject the school's action to the First Amendment standards applicable in designated or limited public fora. Alternatively, even if the district court properly concluded Appellees did not create a public forum, Appellant contends the district court improperly applied *Hazelwood*, 484 U.S. at 273 (holding schools may restrict school-sponsored expression so long as the restriction is "reasonably related to legitimate pedagogical concerns"). Appellant maintains *Hazelwood*'s standards do not apply when (1) the expression occurs during a noncurricular activity, or (2) the school's censorship of expression amounts to viewpoint discrimination. In lieu of applying *Hazelwood*, therefore, Appellant suggests the district court instead should have applied the rigorous standard of *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 511 (1969) (holding schools must tolerate pure student expression unless censorship is "necessary to avoid material and substantial interference with schoolwork or discipline").

---

described several students' experiences with pregnancy, while the other discussed the impact of divorce on students at the school. *Id*. The principal believed the articles were inappropriate for publication because (1) despite the use of pseudonyms, the pregnant girls might be identifiable, (2) references to sexual activity and birth control were inappropriate for younger students, and (3) the divorce story did not give the interviewed students' parents an opportunity to respond or consent to publication. *Id*. The *Hazelwood* Court upheld the restrictions in the face of a First Amendment challenge. It concluded that the articles were school-sponsored speech and that the restrictions were reasonably related to legitimate pedagogical concerns. *Id*. at 273-76.

We review the district court's grant of summary judgment de novo. *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir. 1990). For the reasons that follow, we affirm.

A.    *Public Forum Analysis*

For First Amendment purposes, there are three kinds of government property: (1) traditional public fora, (2) designated public fora, and (3) nonpublic fora. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46 (1983). In this instance, because the mural project was neither a traditional nor a designated public forum, it was a kind of nonpublic forum.

The mural project was not a traditional public forum. "[P]ublic schools do not possess all of the attributes of streets, parks, and other traditional public forums that time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hazelwood*, 484 U.S. at 267 (internal quotation marks and citations omitted).

Neither was the mural project a designated public forum. "The government does not create a public forum by inaction or by permitting limited discourse, but *only by intentionally opening a nontraditional forum for public discourse*." *Id.* (emphasis added; citations and internal quotation marks omitted). Indeed, a school creates a designated public forum only when "school authorities have by

7

policy or practice opened those facilities for indiscriminate use by the general public, or by some segment of the public, such as student organizations." *Id.* (internal quotation marks and citations omitted). When a school retains editorial control over a forum, it has not created a designated public forum. *See id.* at 268 (concluding that a school newspaper was not a public forum because school authorities retained ultimate editorial control over production, publication, and content).

Far from "intentionally" opening a public forum for "indiscriminate use," Appellees merely solicited students to participate in a school beautification project. No record evidence demonstrates Appellees evinced an *intention*, "by policy or practice," to designate the school beautification project as a public forum in which students or anyone else could freely express any and all of their political, religious, or other views. Instead, Appellees always retained editorial control over the murals in at least three ways. First, Principal Harris explicitly instructed students that none of the murals could be profane or offensive. Second, the mural project was supervised by Ms. Roberts, a faculty member. Finally, although Principal Harris told students to express themselves, he never said the murals were a forum for expressing their political or religious views. Thus, we conclude Sharah's expression did not occur in a traditional or designated public forum.

8

For these reasons, the district court correctly held Sharah's expression occurred in a nonpublic forum.

B.     *Scholastic Nonpublic Fora*

Generally, in nonpublic fora, the government can regulate expression so long as its regulations "are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985).  In school settings, however, the analysis is slightly more refined based on the identity of the speaker and the nature of the expression.  Within scholastic nonpublic fora, there are four clear categories of expression: vulgar expression, pure student expression, government expression, and school-sponsored expression.

Vulgar expression is student expression that is lewd, offensive, or indecent, and schools may freely curtail it.  *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986).  Pure student expression is student expression that merely happens to occur on the school premises, and schools must tolerate such expression unless they can reasonably forecast that the expression will lead to "substantial disruption of or material interference with school activities."  *Tinker*, 393 U.S. at 514.  Government expression is expression delivered directly through the government or indirectly through private intermediaries, and the government is

free to make subject-matter-based choices. *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995). Finally, between the spectrum of pure student expression and government expression is the intermediate category of school-sponsored expression: when "students, parents, and members of the public might reasonably perceive [students' expressive activities] to bear the imprimatur of the school," schools may censor student expression so long as their actions are reasonably related to legitimate pedagogical concerns. *Hazelwood*, 484 U.S. at 271–73.

1. *The Imprimatur Test and Curricular Expression*

The district court concluded Sharah's murals were school-sponsored expression, and consequently applied *Hazelwood*. Appellant argues this was error. Citing this Court's opinion in *Searcey v. Harris*, 888 F.2d 1314 (11th Cir. 1989), Appellant contends *Hazelwood* only applies to expression that occurs in the context of curricular activities, as opposed to noncurricular activities. In other words, even if expression is sponsored by or bears the imprimatur of the school, Appellant argues *Hazelwood* only applies when the expression occurs in the context of curricular activities. To complete this argument, Appellant maintains the beautification project did not occur in the context of a curricular activity because (1) Appellees did not require students to participate, (2) students received

10

no grade or credit for participation, (3) the murals were painted on a Saturday outside of regular school hours, and (4) students paid a small fee to participate. As such, Appellant argues Appellees' policy was subject to the rigorous standards of *Tinker*, rather than the standards of *Hazelwood*.

We agree *Hazelwood* only controls school-sponsored expression that occurs in the context of a curricular activity, but conclude Sharah's murals occurred in such a curricular context. Thus, the murals constituted school-sponsored expression within the meaning of *Hazelwood*.

*Hazelwood* controls all expression that (1) bears the imprimatur of the school, and (2) occurs in a curricular activity. *Hazelwood*, 484 U.S. at 271–73; *Searcey*, 888 F.2d at 1319 n.7. Here, there is no question students, parents, and other members of the public might reasonably believe Sharah's murals bear the imprimatur of the school. The murals appear in prominent locations in the school. The first mural is next to the school's main office, the second mural also is near that office, and the third mural appears in a main hallway. Given the location of these murals, a reasonable "observer would likely perceive that the school had a role in setting guidelines for, and ultimately approving, the [murals] it allowed to become a part of the school itself, which in this case, it did." *Fleming v. Jefferson County Sch. Dist. R-1*, 298 F.3d 918, 930 (10th Cir. 2002). More specifically, the

11

beautification project was approved in advance by Principal Harris, advertised by the school, supervised by Ms. Roberts, limited to students and faculty who paid a fee to participate, and subject to the school's editorial control.

The real question is whether Sharah's expression occurred in the context of a curricular activity. In arguing Sharah's expression did not occur in the context of a curricular activity, Appellant underestimates how broadly the *Hazelwood* Court defined curricular activities. To be considered curricular, expressive activities need not occur in a "traditional classroom setting." *Hazelwood*, 484 U.S. at 271. Instead, expressive activities are curricular so long as they are merely (1) "supervised by faculty members," and (2) "designed to impart particular knowledge or skills to student participants and audiences." *Id.* In contrast to Appellant's position, *Hazelwood* never defined curricular activity in terms of whether student participation was required, earned grades or credit, occurred during regular school hours, or did not require a fee.

Here, even though Sharah did not paint her murals in a traditional classroom setting, her expression still occurred in the context of a curricular activity. The first prong is met because Principal Harris and Ms. Roberts were faculty members who supervised the beautification project. Likewise, the second prong is satisfied because the beautification project was designed to impart particular knowledge

12

and skills to student participants and audiences; it allowed student participants to express themselves artistically, allowed student audiences to appreciate their fellow students' artwork, and promoted school spirit, among other things. Appellant's arguments that Sharah's expression did not occur in the context of a curricular activity—because students were not required to participate, they received no grade or credit for participation, the murals were painted on a Saturday outside of regular school hours, and students paid a small fee to participate—simply have no toehold in the relevant legal doctrines. They ignore how broadly the Supreme Court has defined school curricula for *Hazelwood*'s purposes. As such, Sharah's expression occurred in the context of a curricular activity.

Sharah's expression bore the imprimatur of the school and occurred in the context of a curricular activity, so Appellees can censor her expression subject to the limitations announced in *Hazelwood*.

2.      *Viewpoint or Content Restriction?*

Appellant maintains that, although *Hazelwood* permits subject-matter-based restrictions on school-sponsored student expression, it does not permit viewpoint-based discrimination. We agree with Appellant that *Hazelwood* does not allow a school to censor school-sponsored speech based on viewpoint. *See Searcey*, 888

13

F.2d at 1325 ("[a]lthough *Hazelwood* provides reasons for allowing a school official to discriminate based on *content*, we do not believe it offers any justification for allowing educators to discriminate based on viewpoint.") (emphasis in original).[4]  In this case, however, the school did not engage in viewpoint discrimination, but rather censored the murals on the basis of their content.  We reject the contention that *Rosenberger* and *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384 (1993), require us to view the school's actions here as a form of impermissible viewpoint discrimination.  The school's refusal to allow Sharah, or anyone else, to make explicitly religious statements in murals that literally became part of the school's walls is unlike the restrictions at issue in these cases.

Both decisions involved schools that prevented speakers from participating in a school-created forum because of the speakers' religious viewpoints.  In *Lamb's Chapel*, a school board had a policy of allowing groups to use school

---

[4] In *Searcey*, we addressed whether *Hazelwood* permitted viewpoint-based discrimination in a case brought by a nonstudent group, the Atlanta Peace Alliance (APA), that wanted to speak at a school's career day.  888 F.2d at 1315.  The school did not let the APA speak. *Id.*  We held the school could not exclude the APA from its career day, and stated that "[w]ithout more explicit direction, we will continue to require school officials to make decisions relating to speech which are viewpoint neutral." *Id.* at 1325.  Our conclusion in *Searcey* that *Hazelwood* does not permit viewpoint discrimination encompasses the sort of school-sponsored speech that was at issue in *Hazelwood*, which was student speech in a school-sponsored newspaper. *Hazelwood*, 484 U.S. at 273.

14

property after-hours for a variety of social, civic, and recreational uses. 508 U.S. at 386. Regulations adopted by the board required that the "school premises shall not be used by any group for religious purposes." *Id*. at 387. Based on this regulation, the board refused a church group's request to screen a film series presenting a psychologist's "views on the undermining influences of the media that could only be counterbalanced by returning to traditional, Christian family values instilled at an early stage." *Id*. at 388-89. The Supreme Court found that the board's decision to deny access to the group constituted viewpoint discrimination, since the group was prevented from discussing the otherwise permissible topics of child rearing and family values because of the group's religious perspective. *Id*. at 393-94.

In *Rosenberger*, students at the University of Virginia sought and were denied funding for a "magazine of philosophical and religious expression" that addressed topics, such as racism, of daily importance to university students. 515 U.S. at 825-26. Because other student publications, without a religious perspective, were allowed to address these approved subjects, the Court held that the regulation amounted to viewpoint discrimination. *Id*. at 831-32. Importantly, the *Rosenberger* Court explained that the University did not restrict the subject matter of religion. *Id*. at 831. ("By the very terms of the [University's]

prohibition, the University *does not exclude religion as a subject matter* but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints.") (emphasis added).

Based on the above, we find both cases readily distinguishable from the facts of the current case. We note initially that neither *Lamb's Chapel* nor *Rosenberger* involved school-sponsored speech that could be attributed to the school. *Lamb's Chapel*, 508 U.S. at 395 (observing that "[t]he showing of this film series would not have been during school hours" and "would not have been sponsored by the school") ; *Rosenberger*, 515 U.S. at 841 ("In this case, 'the government has not fostered or encouraged' any mistaken impression that the student newspapers speak for the University. The University has taken pains to disassociate itself from the private speech involved in this case.") (internal quotation marks and citation omitted). Despite the absence of school-sponsored speech in these cases, Appellant would have us adopt a reading of these decisions that would *require* a school, under the circumstances presented here, to allow students to use the walls of a public school to proselytize. In our view, neither case mandates such a result.

Unlike the speech censored in *Lamb's Chapel* and *Rosenberger*, Sharah was not discussing secular topics from a religious perspective. Sharah's first mural

16

(which included an image of a crucifix and the words "Because He ♥ed, He Gave.", based on *John* 3:16) referred to Christ's crucifixion. Sharah's second mural ("Jesus has time for you; do you have time for Him?") was a call for students to develop a personal relationship with Christ. The last mural by Sharah's colleagues ("God Loves you. What Part of Thou Shalt Not Didn't You Understand? God.") purported to be a message from God. These are obviously inherently religious messages, which cannot be recast as the discussion of secular topics from a religious perspective. Since the school did not permit any student in the context of a curricular activity to communicate such messages, it restricted speech on the basis of content, not viewpoint.[5] Therefore, *Lamb's Chapel* and *Rosenberger* do not bar the school's non-discriminatory response to the controversy generated by Sharah's murals.

As explained earlier, a school's content-based censorship of school-sponsored student expression survives review under *Hazelwood* if it is reasonably related to legitimate pedagogical concerns. 484 U.S. at 273. Here, the district court correctly held that Appellees had a legitimate pedagogical concern in

---

[5] As the *Rosenberger* Court explained, "[t]he necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for . . . the discussion of certain topics." 515 U.S. at 829. This statement presupposes the legitimacy of content-based regulations in a limited public forum.

avoiding the disruption to the school's learning environment caused by Sharah's murals. *Fleming*, 298 F.3d at 934. Appellees' policy in prohibiting religious expression on its walls was reasonably related to this legitimate pedagogical concern because it ended the disruption. *See id.*

### III.  CONCLUSION

For the foregoing reasons, we conclude Sharah's murals were school-sponsored expression in a nonpublic forum subject to restriction under *Hazelwood* because they occurred in the context of a curricular activity, and students, parents, and members of the public might reasonably believe them to bear the imprimatur of the school. We hold Appellees' censorship of Sharah's school-sponsored murals was a reasonable content-based restriction that was rationally related to the legitimate pedagogical concern of avoiding the religious controversy and debate generated by Sharah's murals.

AFFIRMED.

BLACK, Circuit Judge, specially concurring:

I join the result reached by the majority decision. I write separately because I do not believe *Rosenberger v. Rector & Visitors of the University of Virginia*, 515 U.S. 819, 115 S. Ct. 2510 (1995) and *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384., 113 S. Ct. 2141 (1993) are as readily distinguishable from the present case as the majority. I think these cases compel us to conclude that this was an instance of viewpoint-based discrimination, not content-based discrimination. A finding of viewpoint discrimination, however, does not change the result in this case because *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S. Ct. 562 (1988), allows for viewpoint-based discrimination against school-sponsored student expression.

In *Hazelwood*, the Supreme Court addressed the First Amendment implications of a high school principal's excision of two pages worth of articles from a high school newspaper. In that case, a high school journalism class wrote and edited a school newspaper called *Spectrum*. *Hazelwood*, 484 U.S. at 262, 108 S. Ct. at 565. In one issue of the paper, two articles were scheduled to appear discussing student pregnancy and the impact of divorce on students. *Id.* at 263, 108 S. Ct. at 565–66. The principal objected to the publication of the articles because he believed, *inter alia*, that the material was not suitable for younger

19

students. *Id.* at 263, 108 S. Ct. at 566. Accordingly, the principal cut the entire two pages on which these articles appeared. *Id.* at 263–64, 108 S. Ct. at 566.

The Supreme Court held the school was not required to promote affirmatively this particular school-sponsored student expression. It explained the school's decision was reasonably related to the legitimate pedagogical concern, among other things, of preventing the distribution of "frank talk" about girls' "sexual histories and their use or nonuse of birth control. . . . in a school-sponsored publication distributed to 14-year-old freshmen and presumably taken home to be read by students' even younger brothers and sisters." *Id.* at 274–75, 108 S. Ct. at 572. In reaching this conclusion, however, unlike the approach of typical nonpublic forum cases such as *Cornelius v. NAACP Legal Defense & Education Fund, Inc.*, 473 U.S. 788, 105 S. Ct. 3439 (1985), the Supreme Court did not clarify whether schools could make this decision solely on the basis of the student expression's subject matter, or also on the basis of the student expression's viewpoint.

In *Searcey v. Harris*, 888 F.2d 1314 (11th Cir. 1989), we examined whether *Hazelwood* permitted viewpoint-based discrimination in the context of school-sponsored non-student expression. There, the school refused to let a nonstudent group speak at the school's career day. *Id.* at 1315. We concluded the school's

20

actions did not run afoul of *Hazelwood* and stated that "[w]ithout more explicit direction, we will continue to require school officials to make decisions relating to speech which are viewpoint neutral." *Id.* at 1325.

Appellant, therefore, contends *Searcey* dictates that *Hazelwood* proscribes censorship of school-sponsored student expression on the basis of viewpoint. I disagree. On the contrary, *Searcey* does not control the instant situation because it did not involve school-sponsored *student* expression. Instead, *Searcey* involved a non-student outside group that wanted to speak at a school function. As such, *Searcey* merely stands for the proposition that when a school has opened itself to outside speakers for some school-sponsored function, such as career day, it may not discriminate against the outside speakers' viewpoints. I am compelled to distinguish *Searcey* and conclude *Hazelwood* permits viewpoint-based discrimination against school-sponsored *student* expression for three reasons.

First, language in the *Hazelwood* opinion itself suggests schools may censor school-sponsored student expression on the basis of its viewpoint:

> A school must also retain the authority to refuse to sponsor *student speech* that might unreasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with the shared values of a civilized social order, or to associate the school with any position other than neutrality on matters of political controversy.

*Hazelwood*, 484 U.S. at 271, 108 S. Ct. at 570 (emphasis added; citations and internal quotation marks omitted).  This language suggests schools may promote school-sponsored student expression that advocates certain views, while simultaneously censoring school-sponsored student expression that advocates contrary views.  This is the epitome of discrimination based on viewpoint.  We did not deal with student expression in *Searcey*; therefore we had no reason to address this *Hazelwood* language.

Second, despite *Hazelwood*'s silence on viewpoint neutrality, the majority of our sister circuits to consider the question have held *Hazelwood* permits viewpoint-based discrimination.  The First and Tenth Circuits have held *Hazelwood* permits viewpoint discrimination.  *Fleming v. Jefferson County Sch. Dist. R-1*, 298 F.3d 918, 928 (10th Cir. 2002), *cert. denied*, 537 U.S. 1110, 123 S. Ct. 893 (2003); *Ward v. Hickey*, 996 F.2d 448, 453–54 (1st Cir. 1993).  Only the Ninth Circuit has concluded *Hazelwood* does not permit viewpoint discrimination. *See Planned Parenthood of S. Nev., Inc. v. Clark County Sch. Dist.*, 941 F.2d 817, 829 (9th Cir. 1991) (en banc) (analyzing whether a censorship was viewpoint neutral, without first explaining whether *Hazelwood* requires viewpoint neutrality).

The majority rule of the First and Tenth Circuits better addresses the special situation of public schools by giving educators discretion to discriminate against school-sponsored student expression on the basis of viewpoint. As the Tenth Circuit explained, the *Hazelwood* Court's "specific reasons supporting greater control over school-sponsored speech, such as determining the appropriateness of the message, the sensitivity of the issue, and with which messages a school chooses to associate itself, often will turn on viewpoint-based judgments." *Fleming*, 298 F.3d at 928. "No doubt the school could promote student speech advocating against drug use, without being obligated to sponsor speech with the opposing viewpoint. *Hazelwood* entrusts to educators these decisions that require judgments based on viewpoint." *Id.* I agree. If viewpoint discrimination were forbidden, then a school that allowed a mural to say "God loves you. What part of thou shalt didn't you understand? God" might also have to allow a mural to say "Your God is dead. Long live Beelzebub." This would be an absurd result.

In contrast, the minority approach of the Ninth Circuit is not persuasive because it never explained why *Hazelwood* proscribes viewpoint-based discrimination. Indeed, a Ninth Circuit panel recently criticized the *Planned Parenthood* decision because, "[d]espite the absence of express 'viewpoint neutrality' discussion anywhere in *Hazelwood*, the *Planned Parenthood* court

23

incorporated 'viewpoint neutrality' analysis into nonpublic forum, school-sponsored speech cases in our Circuit." *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1010 (9th Cir. 2000).

Third, as a policy matter, unlike other school-sponsored expression, school authorities need more discretion to control school-sponsored *student* speakers. Schools must not be "unduly constrained from fulfilling their role as a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." *Hazelwood*, 484 U.S. at 272, 108 S. Ct. at 570 (citation and internal quotation marks omitted). Additionally, in the long run, this approach will promote more school-sponsored expression by giving school administrators more control over the viewpoint of such expression.[1] *See id.* at 276 n.9, 108 S. Ct. at 572 n.9 (suggesting that, if administrators were not given such control, schools would tend to silence all school-sponsored expression rather than allow uncontrolled school-

---

[1] I caution, however, that when a school discriminates against expression on the basis of its viewpoint, it runs a greater risk of having its policy struck down for its failure to be reasonably related to legitimate pedagogical concerns. *See* Samuel P. Jordan, Note, *Viewpoint Restrictions and School-Sponsored Student Speech: Avenues for Heightened Protection*, 70 U. Chi. L. Rev. 1555, 1573 (2003) (explaining schools should not allow viewpoint discrimination against school-sponsored expression to be justified "with just any pedagogical purpose"). For example, I would be hard pressed to find a school policy was reasonably related to any legitimate pedagogical concern if it sponsored student expression in favor of Republicans, but did not permit school-sponsored student expression in favor of Democrats, or vice-versa.

24

sponsored expression); *Fleming*, 298 F.3d at 934 ("When posed with such a choice, schools may very well elect to not sponsor speech at all, thereby limiting speech instead of increasing it.").  If schools cannot control the viewpoint of the student expression they sponsor, there will likely be fewer school-sponsored student publications, student theatrical productions, student concerts, student speeches, or other expressive activities for students.

For these reasons, I conclude *Hazelwood* permits schools to discriminate against school-sponsored student expression on the basis of viewpoint.

A school's censorship of school-sponsored student expression survives review under *Hazelwood* if it is reasonably related to legitimate pedagogical concerns.  484 U.S. at 273, 108 S. Ct. at 571.  Here, the district court correctly held Appellees had a legitimate pedagogical concern in avoiding disruption to the learning environment from religious debate erupting on school walls.  *Fleming*, 298 F.3d at 934.  I believe Appellees' policy in prohibiting religious expression on its walls was reasonably related to this legitimate pedagogical concern.[2]

---

[2] Given my conclusion, there is no need for me to address Appellees' alternative argument that they had a legitimate pedagogical concern in avoiding an Establishment Clause violation.

25

Sharah's murals were school-sponsored expression in a nonpublic forum subject to restriction under *Hazelwood* – the murals were painted as part of a curricular activity and the public, as well as teachers and students, could have reasonably believed the murals bore the imprimatur of the school. Although Appellees censored Sharah's school-sponsored murals on the basis of their religious viewpoint, *Hazelwood* permits such viewpoint discrimination so long as the school's actions are reasonably related to legitimate pedagogical concerns. Here, the school's request that Sharah paint over certain parts of her murals was reasonably related to the school's interest in avoiding disruption to the learning environment caused by the reaction to the murals. Therefore, I conclude that the school's viewpoint-based discrimination, not content-based, was permissible under *Hazelwood*.