**William LEE, Plaintiff–Appellant,**

**v.**

**YORK COUNTY SCHOOL DIVISION; Steven R. Staples, In his official capacity as Superintendent of the York County School Division; York County School Board; R. Page Minter; Bar-**

bara S. Haywood; Linda Meadows; Mark A. Medford; Barrent M. Henry, In their official capacity as members of the Board of Education for York County, Defendants–Appellees.

No. 06–1363.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 30, 2006.

Decided May 2, 2007.

**ARGUED:** Gary Alvin Bryant, Willcox & Savage, Norfolk, Virginia, for Appellant. Robert William McFarland, McGuirewoods, LLP, Norfolk, Virginia, for Appellees. **ON BRIEF:** Steve C. Taylor, Chesapeake, Virginia, for Appellant. Steven R. Zahn, McGuirewoods, LLP, Norfolk, Virginia; William H. Baxter, II, Erin M. Sine, McGuirewoods, LLP, Richmond, Virginia, for Appellees.

Before KING and SHEDD, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Judge KING wrote the opinion, in which Judge SHEDD and Senior judge HAMILTON concur.

## OPINION

KING, Circuit Judge.

Plaintiff William Lee appeals from the district court's award of summary judgment to the York County, Virginia, School Board, five members of the County's Board of Education, and the County's School Superintendent (collectively, the "School Board" or the "Board") on his § 1983 free speech claim. *See Lee v. York County Sch. Div.*, 418 F.Supp.2d 816 (E.D.Va.2006) (the "Opinion"). Lee, who teaches high school in York County, initiated this suit in the Eastern District of Virginia in August 2005, maintaining that the School Board had violated his rights under the First Amendment's Free Speech Clause by removing materials he had posted on the bulletin boards in his classroom. In its February 23, 2006 Opinion, the district court rejected Lee's claim, concluding that his postings were curricular in nature and thus did not constitute speech on a matter of public concern. In substance, Lee maintains on appeal that he possesses a First Amendment right to post his materials on the classroom bulletin boards. This contention is contrary to the relevant precedent and, as explained below, we affirm.

### I.

### A.

In 2001, Lee began teaching Spanish at Tabb High School, a public high school operated by the School Board in Yorktown, Virginia.[1] Prior to his assignment at Tabb High, Lee had been employed by the School Board for about a year, as a teacher at a York County middle school. Sometime in October 2004, an employee of the School Board received a complaint from a private citizen who expressed concern over certain materials posted on the bulletin boards within Lee's classroom.[2] The crux of the citizen's complaint was that some of Lee's postings were overly religious in nature. After receiving the complaint, the School Board asked Crispin Zanca, the Principal of Tabb High, to investigate the

---

**1.** The facts underlying this appeal are presented in the light most favor-able to Lee, as he is the non-moving party with respect to the School Board's summary judgment motion. *See Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*, 377 F.3d 408, 418 (4th Cir.2004). The facts are drawn from the summary judgment record made in the district court.

**2.** The identity of the complaining private citizen is sealed, pursuant to a protective order entered by the district court on November 22, 2005.

matter. As Principal, it is Zanca's obligation to ensure that teachers adhere to the Board's curriculum guidelines and policies.

On October 19, 2004, after speaking with the School Board about the complaint regarding Lee, Zanca proceeded to Lee's classroom to discuss the matter with him. Lee was absent from school that day, however, and Zanca examined the materials posted on the bulletin boards in his absence. In so doing, Zanca discovered certain items that, in his view, should not have been posted in a compulsory classroom setting. Specifically, he testified that he "could not find any reason why [these items] would be posted in a classroom." J.A. 161.[3] Zanca removed five items (collectively, the "Removed Items" or the "Items") from Lee's bulletin boards: (1) a 2001 National Day of Prayer poster, featuring George Washington kneeling in prayer; (2) a May 15, 2004, *Daily Press* news article entitled "The God Gap," outlining religious and philosophical differences between President Bush and his challenger John Kerry; (3) an October 14, 2002, *USA Today* news article entitled "White House Staffers Gather for Bible Study," describing how then Attorney General Ashcroft led staffers in voluntary Bible study sessions; (4) a November 1, 2001, *Daily Press* news article, detailing the missionary activities of a former Virginia high school student, Veronica Bowers, who had been killed when her plane was shot down in South America; and (5) a June 2001 Peninsula Rescue Mission newsletter, highlighting the missionary work of Bowers.[4] Zanca placed the Removed Items on Lee's desk in the teachers' lounge and left an explanatory note in Lee's school mailbox.

In his deposition for this case, Zanca testified that neither Tabb High School nor the School Board has any written policies on what a teacher may properly post on classroom walls or bulletin boards. Zanca explained, however, that there is an applicable unwritten policy, custom, and practice for York County teachers in that regard, authorizing teachers to place materials on bulletin boards that relate to the curriculum being taught or that are of personal interest to them. For example, some teachers place famous quotes, articles on current events, and pictures of sports figures on the bulletin boards of their classrooms. Zanca explained that, as a general matter, he has always relied on the sound judgment of Tabb High's teachers as to what materials should be posted in their classrooms.

Although there is no written policy on the posting or removal of classroom materials, Zanca explained that his duties as Principal include the monitoring of such postings, as well as the removal of any postings that are inappropriate for the school setting. In determining whether any particular item should be removed, the School Board has accorded its principals broad discretion to evaluate and decide which postings are appropriate for a particular classroom setting. Zanca testified that the teachers at Tabb High have always understood that any postings contradicting the unwritten policy are subject to removal. Under the unwritten policy, inappropriate postings include items that violate the First Amendment, that are offensive, that use profanity, or that are otherwise unrelated to curricular objectives. In evaluating whether a particular posting is subject to removal, Zanca primarily as-

---

**3.** Citations to "J.A. ___" refer to the Joint Appendix filed by the parties in this appeal.

**4.** Attached to the Peninsula Rescue Mission newsletter was an envelope requesting donations for the organization's missionary work.

sesses whether it is relevant to the curriculum being taught by the particular teacher.[5] He testified that, although certain materials may be inappropriate if posted generally, they could well be appropriate when used in connection with a specific curricular objective. For example, some current events postings may only be appropriate when used in a classroom where history or government courses are taught.

When Zanca first viewed the Removed Items, he saw that certain of the postings prominently included religious terms such as "Bible" or "God." Although Zanca did not read any of the articles in their entirety, he exercised his discretion as Principal on the five Removed Items because he saw them as overly religious and thus violative of the Establishment Clause of the First Amendment.[6] Aside from his determination that the postings might be legally problematic, Zanca believed the Removed Items to be irrelevant to the Spanish curricular objectives that Lee was obliged to follow within his classroom.

When Lee returned to Tabb High three days later, he found the Removed Items on his desk and Zanca's note in his mailbox. Lee promptly discussed the matter with Zanca, who explained that he had received a citizen's complaint about postings in Lee's classroom. Zanca informed Lee that the Removed Items were taken down because they were inappropriate in a Spanish classroom. Lee thereafter retained a lawyer, who wrote to the Board Superintendent requesting permission for Lee to repost the Removed Items. Following an investigation by the Board's counsel, Lee's request to repost was denied.

During his deposition, Lee agreed that the School Board has no written policies concerning what can be appropriately posted on classroom bulletin boards. He acknowledged the existence of an unwritten Board policy, practice, and custom, however, that allows teachers to post materials related to curricular objectives, or to post materials of a general and personal nature that are consistent with the educational mission of Tabb High. Lee denied placing the Removed Items on the bulletin boards to endorse his own faith, did not believe that the Items were related to any particular Spanish curricular objective, and had not referred to any of them while teaching. When asked why he had posted the Removed Items, Lee explained that he had posted each of them either because he liked it or because it was uplifting. He also explained that a teacher could post most anything in a classroom and make it relevant to the curriculum being taught. He said that schoolteachers often use creative materials to catch and retain the attention of students.

Lee also acknowledged that he had posted the Removed Items because they were, in his opinion, "positive and good for the kids." J.A. 53. Because of his position as a teacher, Lee felt responsible for more than just the academic well-being of his

---

5. Prior to the incident underlying this appeal, Zanca had never removed posted materials from any classroom. He has had, however, teachers ask whether a questionable item would be appropriate to post in the classroom prior to so doing. Zanca has also removed inappropriate items posted on bulletin boards in Tabb High's hallways.

6. When the Removed Items were taken from Lee's classroom, Zanca decided not to remove a posted picture of Boy Scouts praying in memory of the September 11, 2001, terrorist attacks or a picture of a United States military pilot whose helmet said "Pray for America." He left the Boy Scouts picture on the bulletin board because many of the students and their parents had been personally affected by the September 11th terrorist attacks, and he felt that the picture embodied a sensitive issue for Tabb High. Zanca left the pilot's picture out of respect for Lee's prior military experience.

students. He stated, "I'm accountable in that classroom for [the students'] welfare and their attitudes and their feelings, which are sensitive and fluctuate daily, and I find the hope embodied in some images to be beneficial." *Id.* For example, with respect to the poster of George Washington, Lee testified that it contained "a positive figure and good for every classroom in the school." *Id.* at 103. With respect to the article on Attorney General Ashcroft, Lee explained it might be helpful to a student seeking hope and inspiration. *See id.* at 61. Finally, with respect to the Peninsular Rescue Mission newsletter, Lee said that it was posted to encourage students not to be ashamed of their faith and because it dealt with an eastern Virginia high school student who had studied Spanish. *See id.* at 68–69.

### B.

On August 11, 2005, Lee filed his Complaint in this case, along with a motion for a preliminary injunction, alleging that the School Board had controverted § 1983 and deprived him of his First Amendment right to free speech.[7] On September 13, 2005, the district court denied Lee's request for a preliminary injunction and or-

dered an expedited discovery schedule. After discovery, both Lee and the School Board filed motions for summary judgment, agreeing that there were no disputes of material fact.

On February 23, 2006, the court filed its Opinion and Final Order in this matter, granting the Board's motion for summary judgment and denying Lee's motion for summary judgment. *See* Opinion 1.[8] Relying on our decision in *Boring v. Buncombe County Board of Education,* 136 F.3d 364 (4th Cir.1998) (en banc), the court applied the Supreme Court's *Pickering–Connick* analysis and assessed whether Lee's postings constituted speech protected by the First Amendment. *See id.* at 7–9.[9] Upon so doing, the court concluded that the Removed Items were, as a matter of law, curricular in nature. *See id.* at 14–16. The court first focused on the broad definition of "curriculum" applied by our en banc Court in *Boring,* noting that "curricular speech encompasses a wide range of types of communication." *Id.* at 13. The court concluded that this definition of curriculum includes teaching methodology, as it "is nothing more than an execution of a teacher's employment duties." *Id.* (citing *Urofsky v. Gilmore,* 216 F.3d 401, 409 (4th

---

**7.** The First Amendment contains, inter alia, a Free Speech Clause and an Establishment Clause. The Free Speech Clause provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." *Id.* Although both clauses are mentioned in this dispute, Lee's § 1983 claim arises under the Free Speech Clause only. The legal principles governing an Establishment Clause claim are thus not at issue in this appeal.

Section 1983 of Title 42 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects ... any citizen of the United States ... to the deprivation of any rights, privileges, or immu-

nities secured by the Constitution and laws, shall be liable to the party injured."

**8.** The district court's Opinion of February 23, 2006, is found in the Joint Appendix at J.A. 282–315.

**9.** The *Pickering–Connick* analysis is derived from the Supreme Court's decisions in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). As further explained herein, this analytical framework is used to determine whether a public employee's speech is protected under the First Amendment. *See Urofsky v. Gilmore,* 216 F.3d 401, 406 (4th Cir.2000) (en banc).

Cir.2000) (en banc) ("It cannot be doubted that in order to pursue its legitimate goals effectively, the state must retain the ability to control the manner in which its employees discharge their duties and to direct its employees to undertake the responsibilities of their positions in a specified way.")).

Applying the *Boring* principles to Lee's free speech claim, the district court concluded that the "postings on Lee's classroom walls qualify as the type of materials that can constitute curricular speech." Opinion 14. Specifically, the court determined that the Removed Items constituted curricular speech for two reasons: (1) Lee used the Items as part of his teaching methodology, and (2) Lee sought to instruct and impart knowledge to his students through use of the Items. *See id.* Because the court determined that the Removed Items were curricular in nature, it also ruled, on the basis of *Boring*, that they were per se not a matter of public concern. *See id.* at 12. Thus, because Lee's speech was not a matter of public concern, he possessed no First Amendment protection in posting the Removed Items in his classroom. *See id.* at 22.

On March 21, 2006, Lee filed a timely notice of appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

As a general proposition, we review de novo a district court's award of summary judgment, viewing the facts in the light most favorable to the non-moving party. *See Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*, 377 F.3d 408, 418 (4th Cir. 2004). An award of summary judgment may appropriately be made only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed. R.Civ.P. 56(c). Finally, in applying the *Pickering–Connick* legal principles to the issues in this appeal, we review de novo the district court's ruling that Lee's postings of the Removed Items did not constitute speech on a matter of public concern. *See Urofsky v. Gilmore*, 216 F.3d 401, 406 (4th Cir.2000) (en banc).

## III.

### A.

On appeal, Lee essentially contends that he possesses a First Amendment free speech right to post certain materials on the School Board's classroom bulletin boards. In addressing this contention, it is important to first acknowledge that schoolteachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Nevertheless, certain limitations are placed on the free speech rights of schoolteachers, such as Lee, due to the nature of their employment by government-operated schools. More specifically, it seems settled that "the state, as an employer, undoubtedly possesses greater authority to restrict the speech of its employees than it has as sovereign to restrict the speech of the citizenry as a whole." *Urofsky v. Gilmore*, 216 F.3d 401, 406 (4th Cir.2000) (en banc); *see also Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) ("[T]he State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.").

In assessing whether a public employee's speech is protected by the First Amendment, and thus not subject to regu-

lation by a state-entity employer, a court is obliged to balance "'the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (alteration in original) (quoting *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731).[10] In performing this balancing test, a reviewing court must make two inquiries. It examines, first of all, "whether the speech at issue was that of a private citizen speaking on a matter of public concern." *Urofsky*, 216 F.3d at 406. If the employee was speaking as a citizen on a matter of public concern, the court must "consider whether the employee's interest in First Amendment expression outweighs the public employer's interest in what the employer has determined to be the appropriate operation of the workplace." *Id.*

As explained below, under the *Pickering–Connick* balancing standard Lee's classroom postings do not constitute speech concerning a public matter, because they were of a curricular nature. Thus, Lee cannot use the First Amendment to justify his assertion that he is free to place his postings on the classroom bulletin boards without oversight by the School Board. In order to constitute protected speech under the First Amendment, the speech at issue must satisfy both prongs of the *Pickering–Connick* framework. *See Urofsky*, 216 F.3d at 406. Because Lee's speech fails to satisfy the first of those inquiries, we need not reach the second inquiry and decide whether the interests of the School Board (as employer) outweigh those of Lee (as teacher-employee).

### B.

In applying the *Pickering–Connick* framework to this matter, we first inquire whether Lee, in posting the Removed Items in his classroom at Tabb High, was speaking as a private citizen on a matter of public concern. Lee maintains on appeal that he can post any materials he wishes on the classroom bulletin boards provided that, in so doing, he speaks not as a teacher, but instead as a private citizen only. He thus maintains that the fact he posted the Removed Items in his classroom is irrelevant to the issue of whether he was acting as a private citizen or as a school-teacher. *See Urofsky*, 216 F.3d at 407 ("An employee may speak as a citizen on a matter of public concern at the workplace, and may speak as an employee away from the workplace."); *but see Garcetti v. Ceballos*, —— U.S. ——, 126 S.Ct. 1951, 1960, 164 L.Ed.2d 689 (2006) (concluding that when public employee speaks pursuant to his official duties, his speech is not entitled to First Amendment protection under the *Pickering–Connick* standard).[11] Lee fur-

---

**10.** In his appellate brief, Lee urges us to reject the *Pickering–Connick* standard, and instead apply what is known as the *Tinker* analysis to his First Amendment free speech claim. The *Tinker* analysis was articulated by the Supreme Court in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) and typically applies to disputes involving the speech of students, not teachers. Under *Tinker*, the School Board would not be able to regulate Lee's speech if it was unrelated to the curriculum and did not "materially and substantially interfere with the requirements

of appropriate discipline in the operation of the school." *Tinker*, 393 U.S. at 509, 89 S.Ct. 733 (internal quotation marks omitted). Because, as explained *infra*, Lee's speech in this dispute was curricular in nature, we are obliged to apply the *Pickering–Connick* standard as articulated in *Boring v. Buncombe County Board of Education*, 136 F.3d 364 (4th Cir.1998) (en banc).

**11.** The Supreme Court in *Garcetti* held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First

ther contends that each of the Removed Items constitutes speech concerning a public matter, because each item involves either a political issue or a matter of interest to the community. *Id.* at 406–07 ("Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community."). He emphasizes that, notwithstanding their religious overtones, the Removed Items involve political information and issues (e.g., the article "The God Gap," explaining information on presidential candidates; the article "White House Staffers Gather for Bible Study," outlining activities of an Attorney General; and the National Day of Prayer poster, advertising a Presidential Proclamation) and matters of general community interest (e.g., the articles concerning a local woman killed in a plane crash).

Contentions such as these might normally be persuasive, and they could well lead a court to conclude that contested speech was made by a private citizen on a matter of public concern. In this case, however, Lee's contentions fail to take account of important considerations of precedent. Courts have generally recognized that the public schools possess the right to regulate speech that occurs within a compulsory classroom setting, and that a school board's ability in this regard exceeds the permissible regulation of speech in other governmental workplaces or forums. *See Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 267, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) ("We thus recognize that the determination of what manner of speech in the classroom ... is inappropriate properly rests with the school board rather than with the federal courts." (internal quotation marks and citation omitted)); *Ed-*

*wards v. Cal. Univ. of Pa.,* 156 F.3d 488, 491 n. 1 (3d Cir.1998) (recognizing that "a public school teacher's in class conduct is not protected by the First Amendment" (internal quotation marks omitted)); *Bishop v. Aronov,* 926 F.2d 1066, 1073 (11th Cir.1991) ("[W]here the in-class speech of a teacher is concerned, the school has an interest not only in preventing interference with the day-to-day operation of its classrooms ..., but also in scrutinizing expressions that the public might reasonably perceive to bear its imprimatur." (internal quotation marks omitted)); *Bradley v. Pittsburgh Bd. of Educ.,* 910 F.2d 1172, 1176 (3d Cir.1990) (concluding that teacher does not possess First Amendment right to choose his own classroom management techniques).

■ Of additional importance, the enhanced right of a school board to regulate the speech of its teachers in classroom settings is supported by the Supreme Court's explicit recognition that First Amendment free speech rights in a school environment are not "automatically coextensive with the rights of adults in other settings." *Hazelwood,* 484 U.S. at 266, 108 S.Ct. 562 (internal quotation marks omitted). As the *Hazelwood* Court explained, the exercise of such rights "must be applied in light of the special characteristics of the school environment." *Id.* (internal quotation marks omitted). Put simply, our school systems are responsible for adequately and properly educating our youth. A school board carrying out this vital responsibility is entitled to some enhanced control over expressions within its classrooms, so that it can "assure ... that readers or listeners are not exposed to

Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 126 S.Ct. at 1960. The Court explicitly did not decide whether this analysis would apply in the same manner

to a case involving speech related to teaching. *Id.* at 1962. Thus, we continue to apply the *Pickering–Connick* standard as articulated in *Boring* to this appeal.

material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school." *Id.* at 271, 108 S.Ct. 562; *see also Ward v. Hickey,* 996 F.2d 448, 452 (1st Cir.1993) ("[I]t is well-settled that public schools may limit classroom speech to promote educational goals."). Thus, "[a] school need not tolerate student [or teacher] speech that is inconsistent with its basic educational mission even though the government could not censor similar speech outside the school." *Id.* at 266, 108 S.Ct. 562 (internal quotation marks and citation omitted).

In order to take account of the characteristics of a dispute involving in-class speech by a teacher-employee, we have concluded that special considerations should be assessed by a reviewing court on whether the contested speech constitutes a matter of public concern.[12] In *Boring v. Buncombe County Board of Education,* for example, we concluded that a teacher's selection of a school play constituted speech that did not implicate a matter of public concern, and thus was not protected by the First Amendment. 136 F.3d 364, 369 (4th Cir.1998) (en banc). The teacher in that case, Margaret Boring, had been transferred for, inter alia, her selection of a controversial school play, *Independence,* that was performed by four high school students at a state competition. *Id.* at 366–67. Boring alleged that her transfer was in retaliation for the selection of the play and therefore violated her First Amendment right of free speech. *Id.* at 367.

In concluding that Boring's speech was not protected by the First Amendment, we analyzed whether the speech at issue—her selection of the school play—was curricular in nature, using the term "curriculum" as it had been defined and applied by the Supreme Court in *Hazelwood. Id.* at 368.[13] There, the Supreme Court defined "curriculum" as

> school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.

484 U.S. at 271, 108 S.Ct. 562. The en banc *Boring* majority decision, authored by our colleague Judge Widener, determined the selection of the school play to be curricular "from the fact that it was supervised by a faculty member, Mrs. Boring; it was performed in interscholastic drama competitions; and the theater program at the high school was obviously intended to impart particular skills, such as acting, to student participants." *Id.* at 368. Judge Widener's opinion concluded that "[t]hese factors demonstrate beyond doubt that 'students, parents, and members of the public might reasonably perceive [the production of the play *Independence* ] to bear the imprimatur of the school.' " *Id.* (altera-

---

**12.** The parties do not contest the proposition that Lee's postings qualify as in-class speech.

**13.** In *Boring,* we examined the definition of "curriculum" in *Webster's Third New International Dictionary* and readily determined that there is no material difference between the dictionary definition of the term and the definition used and applied by the Court in *Hazelwood. See* 136 F.3d at 367–68. For the purposes of this appeal, we rely primarily on the definition applied in *Hazelwood.*

tion in original) (quoting *Hazelwood*, 484 U.S. at 271, 108 S.Ct. 562).

■ The *Boring* Court reasoned that, if contested speech is curricular in nature, it does not constitute speech on a matter of public concern. *See id.* at 368–69. In so concluding, Judge Widener reasoned that disputes over curriculum constitute ordinary employment disputes and do not implicate speech on matters of public concern. *See id.* at 369.[14] Thus, when a First Amendment free speech dispute involves a teacher-employee who is speaking within the classroom, the determination of whether her speech involves a matter of public concern is dependent on whether or not the speech is curricular. This determination—whether the contested speech is curricular in nature—is a question of law for the court.[15]

### C.

In evaluating whether a schoolteacher's in-class speech is curricular in nature, and thus not a matter of public concern, we are obliged to apply the *Hazelwood* definition of "curriculum." *Boring*, 136 F.3d at 368. To be curricular under this definition, the contested speech must satisfy both of the definition's categories of requirements. The *Hazelwood* definition first explains that, in order for a school board to regu-

late speech, such speech must constitute school-sponsored expression bearing the imprimatur of the school. 484 U.S. at 271, 108 S.Ct. 562. *Hazelwood* then narrows this broad category by also requiring that, in order to be considered curricular in nature, the speech must also be supervised by faculty members and designed to impart particular knowledge to the students. *Id.* Lee contends on appeal that his classroom postings of the Removed Items do not fit within the *Hazelwood* definition of "curriculum," in that they were neither directly nor indirectly related to the Spanish curricular objectives he is obliged to teach. Furthermore, Lee testified that the Removed Items were not posted for Spanish instructional purposes. According to Lee, because the Removed Items are not related to his instruction of Spanish, they are not curricular speech. Using this narrow definition of curriculum, Lee asserts that he has a First Amendment right to post any such materials on the classroom bulletin boards.

In these circumstances, however, applying the pertinent legal principles, Lee's speech nevertheless was curricular in nature, because his postings of the Removed Items constituted school-sponsored speech bearing the imprimatur of Tabb High School, and they were designed to impart particular knowledge to the students. We

14. The *Boring* Court also addressed Boring's additional contention that "the district court erred in holding that the defendants had a legitimate pedagogical interest in punishing [Boring] for her speech." 136 F.3d at 369. Lee does not contend on appeal that the School Board lacked a legitimate pedagogical interest in removing his postings from the classroom bulletin boards.

15. Although *Boring* did not directly hold that the determination of whether speech is curricular is a question of law, the majority applied the *Hazelwood* definition as if it were an issue of law rather than of fact. *See* 136 F.3d at 367–68 (upholding district court's conclu-

sion that speech was curricular). Furthermore, under our analytical framework, the determination of whether contested speech is a matter of public concern is dependent on whether the speech is curricular in situations involving in-class teacher speech. It is thus reasonable for the curricular determination, like the general determination on whether speech is a matter of public concern, to be a question of law. As such, it is irrelevant that Lee and Zanca may have subjectively believed that the Removed Items were not part of the curriculum of teaching Spanish at Tabb High, because the *Hazelwood* definition encompasses more than a subjective view of curriculum.

assess each of the two categorical requirements of the *Hazelwood* definition—whether the speech is school-sponsored bearing the imprimatur of the school, and whether the speech is supervised by faculty members and designed to impart knowledge to the students—in turn.

### 1.

First, on whether Lee's postings constitute school-sponsored speech bearing the imprimatur of the school, the *Hazelwood* definition of curriculum encompasses more than simply the objectives of a specific course of study taught by a particular teacher. Indeed, our sister circuits have interpreted school-sponsored speech bearing the imprimatur of a school to include a variety of expressive activities that occur on school property. *See, e.g., Fleming v. Jefferson County Sch. Dist. R–1,* 298 F.3d 918, 931 (10th Cir.2002) (concluding that memorial tiles project—permitting residents to design tiles for school walls—was school-sponsored speech bearing imprimatur of school, because it was supervised by school officials and tiles would be placed on school walls); *Ward,* 996 F.2d at 453 (concluding that teacher's in-class statement was school-sponsored speech); *Bishop,* 926 F.2d at 1074 (concluding that professor's classroom statements were school-sponsored expressive activities); *Miles v. Denver Pub. Sch.,* 944 F.2d 773, 777–78 (10th Cir.1991) (concluding that teacher's discussion of school rumor during class was school-sponsored speech). In order to determine whether challenged teacher speech is school-sponsored and bears the imprimatur of the school, a reviewing court must examine whether it has been "so closely connected to the school that it appears that the school is somehow sponsor-ing the speech." *Fleming,* 298 F.3d at 925. A reviewing court should also appraise the level of involvement the school had in organizing or supervising the contested speech. *Id.*[16]

In applying this standard, Lee's postings plainly constitute school-sponsored speech bearing the imprimatur of the school. First, although Lee did not refer to the Removed Items during instructional time, they were constantly present for review by students in a compulsory classroom setting. As a general proposition, students and parents are likely to regard a teacher's in-class speech as approved and supported by the school, as compared to a teacher's out-of-class statements. *See Ward,* 996 F.2d at 453 ("[A] teacher's statements in class during an instructional period are also part of the curriculum and a regular class activity."); *Bishop,* 926 F.2d at 1074 ("Tangential to the authority over its curriculum, there lies some authority over the conduct of teachers in and out of the classroom that significantly bears on the curriculum or that gives the appearance of endorsement by the university."). Furthermore, the Removed Items were not posted on a private bulletin board owned by Lee, but on the school-owned bulletin boards in his classroom. And, according to the parties, these bulletin boards were subject to recognized restrictions on the materials that could be properly posted there. In these circumstances, it would be reasonable for students and parents alike to perceive that materials posted on the classroom bulletin boards were closely connected with Tabb High or had been approved by its administrators. Thus, the materials posted on those bulle-

---

**16.** As discussed by the Tenth Circuit in its *Fleming* decision, certain expressive activities may be closely tied to a school, yet not school-sponsored speech bearing the school's impri-matur. *See* 298 F.3d at 925. Such activities might include those sponsored by outside organizations who happen to use school facilities after school hours. *See id.*

tin boards were likely to be attributed to Tabb High.

Second, the School Board, through Principal Zanca, maintained oversight of the bulletin boards and their postings, including the Removed Items. Although the teachers at Tabb High possess substantial discretion in the selection of items to be posted in their classrooms, their exercise of that discretion was subject to the supervision of the School's Principal. Principal Zanca was responsible for monitoring the classroom bulletin boards, and he had authority to remove inappropriate items. Thus, because the Removed Items were posted on school-owned and -controlled bulletin boards in a compulsory classroom setting, Lee's actions in posting these Items would reasonably be imputed to Tabb High.

### 2.

Although a broad category of speech made in a school setting is properly considered school-sponsored, the *Hazelwood* definition also limits curricular speech by requiring that it be supervised by faculty members and designed to impart particular knowledge to the students. Lee's postings readily satisfy these two requirements, as well. First, as discussed above, the classroom bulletin boards and their contents were supervised by the teachers, who were the only persons in the school authorized to post items on the bulletin boards, and by Principal Zanca, who oversaw and monitored all such postings.

■ Second, although Lee contends that the definition of "curriculum" should be limited to speech related to traditional classroom instruction, classroom speech can readily be designed to impart particular knowledge, and yet not otherwise relate to the curricular objectives that a teacher must follow. Whether classroom speech is designed to impart particular

knowledge has a broader meaning than the name of a traditional course of study, or the designation of materials used to achieve specific curricular objectives. *See Bannon v. Sch. Dist. of Palm Beach County*, 387 F.3d 1208, 1214–15 (11th Cir.2004) (per curiam) (concluding that after-school beautification project, which permitted students to paint murals on school's walls, was designed to impart particular knowledge to students because "it allowed student participants to express themselves artistically, allowed student audiences to appreciate their fellow students' artwork, and promoted school spirit"). Classroom speech can impart particular knowledge if its purpose is to convey a specific message or information to students. That specific message need not relate to, for example, Spanish instruction, but could instead constitute information on social or moral values that the teacher believes the students should learn or be exposed to.

In the circumstances presented here, the Removed Items were plainly "designed to impart particular knowledge" to the students in Lee's classroom. Lee testified that, along with his obligation to teach Spanish, he was responsible for the emotional and moral well-being of his students. In order to satisfy this responsibility, Lee posted the Removed Items on the classroom bulletin boards to inform his students of certain positive figures and these figures' social and moral values. For example, Lee posted the poster of George Washington because he wanted to show the students that George Washington was a positive figure in American history. He posted the newspaper articles on President Bush and Attorney General Ashcroft because he wanted to show the students examples of political figures he believes have good social and religious values. Finally, Lee posted the articles on the local missionary to show the students an example of

a local person who used her ability to speak Spanish to help others and who was not ashamed of her faith. Through these postings, Lee sought to impart the particular knowledge of these figures and their values to his students in order to expose the students to social and moral values he deemed beneficial to their emotional growth.

Although schoolteachers provide more than academic knowledge to their students, it is not a court's obligation to determine which messages of social or moral values are appropriate in a classroom. Instead, it is the school board, whose responsibility includes the well-being of the students, that must make such determinations. Our conclusion on this point is entirely consistent with the "oft-expressed view that the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local officials, and not of federal judges." *Hazelwood*, 484 U.S. at 273, 108 S.Ct. 562. As observed by Judge Widener in *Boring*, "it is far better public policy, absent a valid statutory directive on the subject, that the makeup of the curriculum be entrusted to the local school authorities who are in some sense responsible, rather than to the teachers, who would be responsible only to the judges." 136 F.3d at 371.

Because the Removed Items constitute school-sponsored speech bearing the imprimatur of the school, and they were designed to impart particular knowledge to the students at Tabb High, the Items are curricular in nature. As such, the dispute over Lee's postings of the Removed Items

is nothing more than an ordinary employment dispute. *See Boring*, 136 F.3d at 369 (concluding that disagreements over curricular speech constitute ordinary employment disputes). The Items do not constitute speech on a matter of public concern and are not protected by the First Amendment. *See id.*[17]

## IV.

Pursuant to the foregoing, we affirm the district court's award of summary judgment to the School Board.

*AFFIRMED.*

---

**17.** In his appellate brief, Lee contends, in the alternative, that the School Board violated his First Amendment free speech rights because it censored his postings on the basis of their viewpoint in an nonpublic forum, and because the Board did not provide him with any written guidelines on what could be posted. Because Lee's speech was curricular and thus

not on a matter of public concern, it is not accorded any First Amendment free speech protection. *See Urofsky*, 216 F.3d at 406 ("If a public employee's speech made in his capacity as a private citizen does not touch upon a matter of public concern, the state, as employer, may regulate it without infringing any First Amendment protection.").