[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 16, 2011
JOHN LEY
CLERK

No. 10-13925

_____

D.C. Docket No. 1:10-cv-00099-JRH-WLB

JENNIFER KEETON,

Plaintiff - Appellant,

versus

MARY JANE ANDERSON-WILEY,
Associate Professor, Augusta State University,
PAULETTE SCHENCK,
Assistant Professor,
RICHARD DEANER,
Assistant Professor,
WAYNE LORD,
Chairman of Department of Educational Leadership, Counseling and
Special Education,
GORDON EISENMAN,
Dean of College of Education, et al.,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(December 16, 2011)

Before BARKETT, PRYOR and KRAVITCH, Circuit Judges.

BARKETT, Circuit Judge:

Jennifer Keeton was enrolled in the Counselor Education Program at
Augusta State University (ASU), a Georgia state school, seeking to obtain her
master's degree in school counseling. After Keeton completed her first year in the
program, ASU's officials asked her to participate in a remediation plan addressing
what the faculty perceived as deficiencies in her "ability to be a multiculturally
competent counselor, particularly with regard to working with gay, lesbian,
bisexual, transgender, and queer/questioning (GLBTQ) populations."[1] ASU's

---

[1] The ASU student handbook authorizes ASU officials to place a student on "remediation
status" when a "student's progress is not satisfactory on interpersonal or professional criteria
unrelated to academic performance." The student then receives a remediation plan "outlining the
faculty's concerns" and "delineat[ing] what conditions the student must meet to be removed from
remediation status." A remediation plan is not, however, a disciplinary measure. Instead, as one
ASU official described it, a remediation plan is "a plan to deal with the professional part of the
curriculum that goes across the program, goes across classes. It's a plan that is devised with
students in order to help students to grow professionally in areas of weakness."

officials required Keeton's consent to the remediation plan before Keeton could participate in the program's clinical practicum, in which she would have to counsel students one-on-one. Rather than completing the remediation plan, Keeton filed this action pursuant to 42 U.S.C. § 1983, alleging that requiring her to complete the remediation plan violated her First Amendment free speech and free exercise rights.[2] Along with her verified complaint, Keeton also filed a motion for a preliminary injunction that would prevent ASU's officials from dismissing her from the program if she did not complete the remediation plan. After holding an evidentiary hearing, the district court denied her motion for a preliminary injunction, and it is from this order that Keeton now appeals.[3]

## I. Standard of Review

A district court may grant a preliminary injunction only when the moving party demonstrates: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the moving party outweighs whatever damage the proposed

---

[2] The defendants are ASU officials and members of the Board of Regents of the University System of Georgia.

[3] After the district court denied her motion for a preliminary injunction, Keeton was expelled from ASU, as she refused to complete the remediation plan. Now, in appealing the district court's order denying her motion for a preliminary injunction, she seeks an injunction requiring ASU's officials to reinstate her in the program.

injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest. BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Services, LLC, 425 F.3d 964, 968 (11th Cir. 2005).

In First Amendment cases, we review a district court's decision to grant or deny a preliminary injunction under a unique abuse of discretion standard. Questions of law are reviewed de novo. American Civil Liberties Union of Florida, Inc. v. Miami-Dade Cnty. School Bd., 557 F.3d 1177, 1198 (11th Cir. 2009) ("ACLU of Florida"). The district court's findings of ordinary historical facts are reviewed for clear error, id. at 1206, but the district court's findings of "constitutional facts" are reviewed de novo, id. at 1203. Ordinary facts are the "who, what, where, when, and how of the controversy." Id. at 1206. In contrast, constitutional facts are the "crucial" or "ultimate" facts that determine whether the defendant's actions violated the First Amendment. Id. at 1205.

## II. Background

The record, which at this stage of the proceedings consists of the verified complaint, the text of the remediation plan, correspondence between Keeton and ASU's officials, declarations of several ASU students and officials, and the testimony of several ASU officials offered at an evidentiary hearing on Keeton's

4

motion for a preliminary injunction, shows the following.

In her brief, Keeton describes herself as a Christian who is committed to the truth of the Bible, including what she believes are its teachings on human nature, the purpose and meaning of life, and the ethical standards that govern human conduct. She holds several beliefs about homosexuality that she views as arising from her Christian faith. She believes that "sexual behavior is the result of personal choice for which individuals are accountable, not inevitable deterministic forces; that gender is fixed and binary (i.e., male or female), not a social construct or personal choice subject to individual change; and that homosexuality is a 'lifestyle,' not a 'state of being.'" ASU's officials became aware that Keeton held these beliefs when she expressed to professors in class and fellow classmates in and out of class that she believed that the GLBTQ population suffers from identity confusion, and that she intended to attempt to convert students from being homosexual to heterosexual. Keeton also said that it would be difficult for her to work with GLBTQ clients and to separate her views about homosexuality from her clients' views. Further, in answering a hypothetical posed by a faculty member, Keeton responded that as a high school counselor confronted by a sophomore student in crisis, questioning his sexual orientation, she would tell the student that it was not okay to be gay. Similarly, Keeton told a fellow classmate that, if a

client discloses that he is gay, it was her intention to tell the client that his behavior is morally wrong and then try to change the client's behavior, and if she were unable to help the client change his behavior, she would refer him to someone practicing conversion therapy.

ASU's officials determined that, through these statements, Keeton expressed her intent to violate several provisions of the American Counseling Association's (ACA) Code of Ethics, which ASU was required to adopt and teach in order to offer a counseling program accredited by the Council for Accreditation of Counseling and Related Educational Programs (CACREP).[4]  Among the sections of the ACA Code of Ethics that Keeton's statements indicated she would violate are:

> (1) Section A.1.a: "The primary responsibility of counselors is to respect the dignity and to promote the welfare of clients";
>
> (2) Section A.4.b: "Counselors are aware of their own values, attitudes, beliefs, and behaviors and avoid imposing values that are

---

[4] Graduating from a school accredited by the Council for Accreditation of Counseling and Related Educational Programs, in turn, is a requirement for obtaining a Professional Counselor license in Georgia.  See Georgia Application for Licensure as a Professional Counselor, http://sos.georgia.gov/acrobat/PLB/41%20Licensed%20Professional%20Counselor%20Applicati on.pdf (last visited November 22, 2011) (requiring a master's degree primarily counseling in content from an institution accredited by a regional body recognized by the Council on Higher Education Accreditation); Council for Higher Education Accreditation Database of Institutions and Programs, http://www.chea.org/search/search.asp (last visited November 22, 2011) (recognizing Council for Accreditation of Counseling and Related Educational Programs as a Program Accreditor).

inconsistent with counseling goals.  Counselors respect the diversity of clients, trainees, and research participants";

(3) Section C.2.a: "Counselors gain knowledge, personal awareness, sensitivity, and skills pertinent to working with a diverse client population"; and

(4) Section C.5: "Counselors do not condone or engage in discrimination based on age, culture, disability, ethnicity, race, religion/spirituality, gender, gender identity, sexual orientation, marital status/partnership, language preference, socioeconomic status, or any basis proscribed by law."

Before Keeton could participate in the program's clinical practicum, in which she would have engaged in one-on-one counseling with a student, ASU's officials asked her to participate in a remediation plan, to help her learn how to comply with the ACA Code of Ethics and improve her "ability to be a multiculturally competent counselor, particularly with regard to working with [GLBTQ] populations."  As mentioned above, the ASU student handbook authorizes the imposition of a remediation plan when a student's performance is "not satisfactory on interpersonal or professional criteria unrelated to academic performance."  Similarly, the ACA Code of Ethics requires counselor educators to "address the inability of some students to achieve counseling competencies that might impede performance."  In accordance with CACREP guidelines, the faculty assesses every student each semester to determine whether they are having

difficulties that need to be addressed through a remediation plan. In the past,

remediation plans have been drafted for students who have had difficulty with

writing assignments,"performing the skills particular to a counseling internship

setting," receiving feedback from their supervisors, and "working with other

multi-cultural populations, like the African-American population." Keeton's

remediation plan required her to:

> (1) attend at least three workshops which emphasize improving cross-cultural communication, developing multicultural competence, or diversity sensitivity training toward working with the GLBTQ population;[5]

> (2) read at least ten articles in peer-reviewed counseling or psychological journals that pertain to improving counseling effectiveness with the GLBTQ population;[6]

> (3) work to increase her exposure and interaction with the GLBTQ population by, for instance, attending the Gay Pride Parade in Augusta;[7]

---

[5] The goal of this requirement, an ASU official testified, was for Keeton to develop a sensitivity for and understanding of the issues facing the GLBTQ population.

[6] ASU's officials provided Keeton with a list of articles from which she could choose addressing, among other things, providing support for and reducing victimization of the GLBTQ population within school settings.

[7] The purpose of this requirement, like the first requirement, was for Keeton to develop a better understanding of and sensitivity for the GLBTQ population. This requirement is similar to an assignment in the program's diversity sensitivity training class, which requires students to expose themselves to a population that they may not be comfortable with. Keeton was not required to attend the Gay Pride Parade; it was just one example of an activity she could do that would satisfy the requirement.

8

> (4) familiarize herself with the Association for Lesbian, Gay,
> Bisexual and Transgender Issues in Counseling ("ALGBTIC")
> Competencies for Counseling Gays and Transgender Clients;[8] and
>
> (5) submit a two-page reflection to her advisor every month
> summarizing what she learned from her research, how her study has
> influenced her beliefs, and how future clients may benefit from what
> she has learned.[9]

Other parts of the remediation plan addressed Keeton's deficient writing skills, but those parts are not at issue here. Based on Keeton's written reflections and two scheduled meetings, the faculty would "decide the appropriateness of her continuation in the counseling program."

School officials held several meetings with Keeton to discuss the remediation plan. Although Keeton did not testify at the evidentiary hearing, she had alleged in her verified complaint that officials told her that "you couldn't be a teacher, let alone a counselor, with those views," asked her to alter some of her beliefs, and said that she had a choice of adhering to the Bible or to the ACA Code of Ethics. At the evidentiary hearing and in declarations, the officials categorically denied making these statements and testified that they never told her

---

[8] ALGBTIC is a certified division of the ACA. Competencies are "knowledge, skills, [and] abilities" that counselors must possess in order to effectively work with a particular population.

[9] This requirement was imposed so that Keeton could demonstrate to the faculty that she had developed a sensitivity for the GLBTQ population and "an awareness of how her own beliefs may differ from those of the client so that she not impose her beliefs on the client."

9

that she needed to alter her beliefs or that her beliefs were wrong or unethical, and that she could continue to maintain her personal religious beliefs and still become an effective counselor. Consistent with this testimony, a handwritten summary of one of the meetings, which Keeton signed, made no mention of ASU officials asking her to alter her beliefs. Additionally, when Keeton wrote an email to ASU's officials stating that she believed that she was being asked to alter her personal religious beliefs, they responded with an addendum to the remediation plan emphasizing that she was not being asked alter her personal religious beliefs, and informing her that she would have to be dismissed from the program if she did not complete the remediation plan.

After the meetings, Keeton initially agreed to participate in the remediation plan and assured school officials that she would "learn to separate [her] personal values and beliefs from those of the client so that she may attend to any need of future clients in an ethical manner." Based on these assurances, the faculty agreed to allow Keeton to enroll in the program's clinical practicum while she completed the remediation plan. Soon thereafter, however, Keeton changed her mind and sent school officials an email withdrawing from the program and stating, "I am not going to agree to a remediation plan that I already know I won't be able to successfully complete." Keeton then filed this action, alleging that ASU's

10

officials' actions violated her First Amendment free speech and free exercise rights.

### III. Discussion

#### A. Free Speech Claims

"[S]tate colleges and universities are not enclaves immune from the sweep of the First Amendment." Healy v. James, 408 U.S. 169, 180 (1972). At the same time, however, in student speech cases, "First Amendment rights must be analyzed in light of the special characteristics of the school environment." Widmar v. Vincent, 454 U.S. 263, 268 n.5 (1981) (internal quotation marks omitted).

Keeton claims that ASU's officials violated her First Amendment free speech rights in three ways: by discriminating against her viewpoint; by retaliating against her for exercising her First Amendment rights; and finally by compelling her to express beliefs with which she disagrees. We address each specific claim in turn.

#### 1. Viewpoint Discrimination

To analyze Keeton's viewpoint discrimination claim, we must first engage in forum analysis, as the government's power to restrict speech "depends on the nature of the relevant forum" at issue. Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 800 (1985). The Supreme Court has identified three

categories of forums: traditional public forums, designated public forums, and nonpublic forums. Bannon v. Sch. Dist. of Palm Beach Cnty., 387 F.3d 1208, 1212 (11th Cir. 2004). ASU's counseling program is not a traditional public forum, as it does not "possess all of the attributes of streets, parks, and other traditional public forums that 'time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 267 (1988) (quoting Hague v. CIO, 307 U.S. 496, 515 (1939)). Nor could the program be considered a designated public forum, as there is no indication in the record that "school authorities have 'by policy or by practice' opened [the program] 'for indiscriminate use by the general public,' or by some segment of the public." Id. at 267 (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 47 (1983)). Instead, ASU has reserved it for the intended purpose of "a supervised learning experience," connected in this case to the requirements of a professional association whose accreditation is required for the school to offer a degree that allows its students to become licensed as professional counselors. Id. at 270. We thus find that ASU's counseling program constitutes a nonpublic forum. See Bishop v. Aronov, 926 F.2d 1066, 1071 (11th Cir. 1991) (holding that a university classroom is a not "an open forum during instructional time"). As such, school

12

officials "may impose restrictions on speech that are reasonable and viewpoint neutral." Pleasant Grove City v. Summum, 555 U.S. 460, 470 (2009). Accordingly, we must ask two questions in analyzing Keeton's viewpoint discrimination claim: (1) whether the remediation plan was a reasonable restriction on her speech; and (2) whether the remediation plan was viewpoint neutral.

We first consider the neutrality question. In general, "[d]iscrimination against speech because of its message is presumed to be unconstitutional." Rosenberger v. Rector and Visitors of University of Virginia, 515 U.S. 819, 828 (1995). Thus, if ASU's officials imposed the remediation plan because of Keeton's personal religious views on homosexuality, it is presumed that they violated her constitutional rights. The crucial or ultimate fact that will determine Keeton's viewpoint discrimination claim, then, is ASU's motivation for imposing the remediation plan, making it a constitutional fact. See ACLU of Florida, 557 F.3d at 1206-07 (holding that a school board's motive for banning a book from the school library was a constitutional fact). Accordingly, we must examine the entire record as a whole to determine whether ASU's imposition of the remediation plan was intended to discriminate against her personal and religious viewpoint or was viewpoint neutral. Id.

We conclude that the evidence in this record does not support Keeton's

claim that ASU's officials imposed the remediation plan because of her views on homosexuality. Rather, as the district court found, the evidence shows that the remediation plan was imposed because she expressed an intent to impose her personal religious views on her clients, in violation of the ACA Code of Ethics, and that the objective of the remediation plan was to teach her how to effectively counsel GLBTQ clients in accordance with the ACA Code of Ethics.

As Keeton did not testify at the evidentiary hearing, she relies primarily on the allegations in her verified complaint and certain statements made in the remediation plan and the addendum to the remediation plan to support her claims. In particular, she points to her allegations that ASU's officials told her during the remediation plan meetings that she needed to alter her beliefs. However, the evidence overwhelmingly shows that ASU's officials were not asking her to change her beliefs. For instance, Keeton's fellow students stated in declarations that professors told Keeton in class that she did not need to change her beliefs, but instead needed to be aware of her beliefs and not impose them on the client. Likewise, ASU's officials testified that Keeton could still hold her personal religious beliefs and become an effective counselor as long as she separated those beliefs from her work, and that students holding the same beliefs as Keeton have been successful in the program. Further, ASU's officials wrote in the addendum

to the remediation plan that "the intent of the remediation plan is not necessarily to alter your views about sexual orientation, or about any of your other personal beliefs." Given this evidence, the district court did not err in finding that Keeton's allegations were insufficient to prove that ASU's officials sought to alter her beliefs.

Keeton also points to the following language from the remediation plan chronicling her beliefs about homosexuality to argue that the remediation plan was imposed because of her beliefs regarding homosexuality:

> Another equally important question that has arisen over the last two semesters is Jen's ability to be a multiculturally competent counselor, particularly with regard to working with [GLBTQ] populations. Jen has voiced disagreement in several class discussions and in written assignments with the gay and lesbian "lifestyle." She stated in one paper that she believes GLBTQ "lifestyles" to be identity confusion. This was during her enrollment in the Diversity Sensitivity course and after the presentation on GLBTQ populations. Faculty have also received unsolicited reports from another student that she has relayed her interest in conversion therapy for GLBTQ populations, and she has tried to convince other students to support and <u>believe</u> her views.

And she additionally refers to the following language from the addendum to the remediation plan:

> Concerns related to your ability to maintain ethical behavior in all counseling situations arose through faculty interactions with you during classes, papers written by you for classes, and behaviors toward and comments to fellow students in your classes. All of these

15

incidents were described in the Remediation Plan. Statements made in your recent emails have confirmed the faculty's concern. In the June 14 email you said "My Christian moral views are not just about me. I think the Bible's teaching is true for all people, and it shows the right way to live." In the June 16 email, you indicated "I believe the Bible's teachings applies to all people on who they are and how they should act . . . From that I see that some behaviors are not moral or positive."

While these statements do refer to Keeton's beliefs, they also make clear that the school's primary concern was her "ability to be a multiculturally competent counselor" and her "ability to maintain ethical behavior in all counseling situations." Moreover, at the evidentiary hearing, ASU's officials confirmed that their primary concern was teaching Keeton not to impose her values on clients and how to become a more effective counselor. Also, in the addendum to the remediation plan, which was added in direct response to Keeton's email claim that she believed she was being asked to alter her personal religious beliefs, ASU's officials clarified that "[t]he content of your moral or religious beliefs is not in question," and that the remediation plan was concerned with teaching her how "to respond in an ethical manner and avoid imposing your personal values on the client." Likewise, the handwritten summary of one of the meetings, which Keeton and the ASU officials present signed, stated that:

Jen seems to understand the faculty's concern about the ethical violation of imposing one's values on a client. . . . Right now, Jen

cannot affirm and attend to relationship issues of gay and lesbian persons . . . .

These concerns arose from Keeton's own statements that she intended to impose her personal religious beliefs on clients and refer clients to conversion therapy, and her own admissions that it would be difficult for her to work with the GLBTQ population and separate her own views from those of the client. In light of this evidence, the mere references to Keeton's beliefs in the remediation plan and the addendum to the remediation plan do not support her contention that ASU's officials imposed the remediation plan because of her beliefs about homosexuality. Rather, the evidence shows that, in requiring Keeton to learn about and interact with the GLBTQ population, to read articles in counseling or psychological journals about counseling the GLBTQ population, and to become familiar with the ALGBTIC Competencies for Counseling Gays and Transgender clients, ASU's officials sought to teach her how to effectively counsel GLBTQ clients in accordance with the ACA Code of Ethics.

As all graduate students in the program, regardless of their personal beliefs, must counsel clients in accordance with the ACA Code of Ethics and ASU's counseling curriculum, the remediation plan did not single out Keeton for disfavored treatment because of her point of view. All students are taught the

17

ACA's fundamental principles, including that counselors must support their clients' welfare, promote their growth, respect their dignity, support their autonomy, and help them pursue their own goals for counseling. Further, ASU's curriculum requires that all students be competent to work with all populations, and that all students not impose their personal religious values on their clients, whether, for instance, they believe that persons ought to be Christians rather than Muslims, Jews or atheists, or that homosexuality is moral or immoral. As such, ASU's curriculum and the generally applicable rules of ethical conduct of the profession are not designed to suppress ideas or viewpoints but apply to all regardless of the particular viewpoint the counselor may possess. Thus, unlike the cases Keeton relies upon, this is not a case in which a forum was opened to a particular topic or expressive activity and disfavored views on that topic or forms of that activity were suppressed. See Rosenberger, 515 U.S. at 829-31. Indeed, Keeton remains free to express disagreement with ASU's curriculum and the ethical requirements of the ACA, but she cannot block the school's attempts to ensure that she abides by them if she wishes to participate in the clinical practicum, which involves one-on-one counseling, and graduate from the program.

To be sure, as Keeton points out, the remediation plan, in requiring her to spend time reading articles and attending events and workshops, does place a

burden on her that other students who do not intend to express their personal religious beliefs to clients do not have. But it does not follow that this constitutes discrimination against Keeton's views regarding homosexuality. As the Supreme Court held in Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez, 130 S.Ct. 2971 (2010) ("CLS"), when it reviewed a school's "all-comers" policy that required a student group to accept members who did not share the organization's core beliefs about religion and sexual orientation, "[e]ven if a regulation has a differential impact on groups wishing to [express discriminatory views], '[w]here the [State] does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy.'" Id. at 2994 (quoting R.A.V. v. St. Paul, 505 U.S. 377, 390 (1992)). ASU's requirement that counselors not impose their values on clients, as mandated by the ACA Code of Ethics, "'is justified without reference to the content [or viewpoint] of the regulated speech.'" Id. (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)). The remediation plan aims at Keeton's unwillingness to comply with the ACA Code of Ethics. ASU's desire to have its students comply with the ACA Code of Ethics, when it places those students in a clinical practicum with actual clients who might suffer actual harm from a counseler's actions, "'provides

19

an adequate explanation for its [remediation plan] over and above mere disagreement with [Keeton's] beliefs or biases.'" Id. (quoting Wisconsin v. Mitchell, 508 U.S. 476, 488 (1993)). Like the plaintiffs in CLS, Keeton confuses her viewpoint-based objections to ASU's officials' actions with viewpoint discrimination. Id.

Having concluded that the imposition of the remediation plan was viewpoint neutral, we must now consider whether the burden that ASU's officials placed on Keeton's First Amendment rights was reasonable, keeping in mind "the special characteristics of the school environment." Widmar, 454 U.S. at 268 n.5 (internal quotation marks omitted). The Supreme Court was faced with a similar question in Hazelwood School District v. Kuhlmeier, 484 U.S. 260 (1988). In Hazelwood, the Court concluded that high-school officials did not violate the First Amendment when they deleted two pages of articles written and edited by students in a journalism class from the school's newspaper. Id. at 262-64. In doing so, the Court first noted that the school newspaper was not a public forum, because the school had reserved the newspaper for its intended purpose, "a supervised learning experience for journalism students." Id. at 270. As such, the school was "entitled to regulate the contents of [the newspaper] in any reasonable manner." Id. The Court then held that "educators do not offend the First Amendment by exercising

20

editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." Id. at 273. The Court defined "school-sponsored expressive activities" to include "school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." Id. at 271. Such activities, the Court explained, "may fairly be characterized as part of the school curriculum . . . so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." Id.

Hazelwood informs our analysis for two reasons. First, the clinical practicum, which Keeton seeks to participate in, is a "school-sponsored expressive activit[y]," as those who receive counseling in the program and members of the general public "might reasonably perceive [it] to bear the imprimatur of the school." Id. And second, ASU's remediation plan and the clinical practicum are "part of the school curriculum" and are "supervised by faculty members and designed to impart particular knowledge or skills to [Keeton]." Id. Thus, a significant concern underlying Hazelwood—the deference that courts must show to a school's curricular choices, id. at 273—applies here, as enjoining ASU from

21

imposing its remediation plan on Keeton, and forcing ASU to allow Keeton to participate in the clinical practicum, would interfere with ASU's control over its curriculum. The Supreme Court and this Court have voiced this concern on numerous occasions. See, e.g., CLS, 130 S.Ct. at 2988 ("[W]e have cautioned courts in various contexts to resist 'substitut[ing] their own notions of sound educational policy for those of the school authorities which they review.'") (quoting Board of Ed. of Hendrick Hudson Central School Dist. v. Rowley, 458 U.S. 176, 206 (1982)); Regents of University of Michigan v. Ewing, 474 U.S. 214, 225 (1985) ("When judges are asked to review the substance of a genuinely academic decision . . . they should show great respect for the faculty's professional judgment."); Bishop, 926 F.2d at 1075 ("Federal judges should not be ersatz deans or educators.").[10]

Turning to whether ASU's officials' actions were reasonable under the

---

[10] The Tenth Circuit has decided a similar case, Axson-Flynn v. Johnson, 356 F.3d 1277 (10th Cir. 2004), under Hazelwood's framework. In that case, a Mormon student who was enrolled in a university drama program refused, for religious reasons, to use profanity during classroom acting exercises, and as a result of the faculty's repeated demands to "get over" her refusal to use profanity in a play, left the program. Id. at 1280-81. The student claimed that requiring her to utter profanity violated her First Amendment rights. Id. Reasoning that "[f]ew activities bear a school's imprimatur and involve pedagogical interests more significantly than speech that occurs within a classroom setting as part of a school's curriculum," the Tenth Circuit applied Hazelwood's framework to the student's claims. Id. at 1289 (internal quotation marks omitted). Like the activities at issue in Axson-Flynn, Keeton's speech in counseling students would have occurred in the practicum had Keeton been permitted to participate in it, which was part of ASU's curriculum.

22

<u>Hazelwood</u> framework, we find that ASU has a legitimate pedagogical concern in teaching its students to comply with the ACA Code of Ethics.  ASU must adopt and follow the ACA Code of Ethics in order to offer an accredited program, and the entire mission of its counseling program is to produce ethical and effective counselors in accordance with the professional requirements of the ACA. Moreover, the ACA, in addition to several other professional organizations, including the American Psychology Association, holds that "[t]he promotion in schools of efforts to change sexual orientation by therapy or through religious ministries seems likely to exacerbate the risk of harassment, harm, and fear for [GLBTQ] youth."  Just the Facts Coalition, <u>Just the Facts About Sexual Orientation and Youth: A Primer for Principals, Educators, and School Personel</u>, 4 (2008), available at http://www.apa.org/pi/lgbt/resources/just-the-facts.aspx. Keeton indicated that she would impose her personal religious views on GLBTQ clients and refer such clients to counselors who practice conversion therapy, in violation of the ACA Code of Ethics and contrary to what the ACA and clinical literature recognize as an effective counseling practice.  The remediation plan targeted these concerns, seeking to improve Keeton's ability to counsel GLBTQ clients in accordance with the ACA Code of Ethics, notwithstanding her personal beliefs, and thus it was reasonably related to ASU's legitimate pedagogical

concerns in promoting compliance with the ACA Code of Ethics and teaching her to become an effective counselor. Accordingly, the imposition of the remediation plan was a reasonable restriction on Keeton's speech.

A final and key consideration with respect to Keeton's viewpoint discrimination claim is the role that the clinical practicum plays in the curriculum. In Rust v. Sullivan, 500 U.S. 173, 193 (1991), the Supreme Court held that "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." The program in Rust sought to promote the establishment and operation of family planning projects. Id. at 178. To this end, it funded entities that engaged in family planning counseling, but prohibited fund recipients from giving patients abortion-related advice. Id. at 177-78. ASU's clinical practicum is similar to the program in Rust, as it seeks to promote counseling "activities that it believes to be in the public interest." Id. at 193. The defined limits of the clinical practicum require students to provide counseling in accordance with ACA Code of Ethics, which, among other things, prohibits counselors from imposing their values on clients. Just as the government in Rust was free to prohibit its agents "from engaging in activities outside the project's scope," id. at 194, so ASU was

24

free to prohibit its students from engaging in counseling activities, such as providing moral advice, that lie outside the defined scope of the clinical practicum. Keeton does not have a constitutional right to disregard the limits ASU has established for its clinical practicum and set her own standards for counseling clients in the clinical practicum.

Our Court, too, has recognized the government's power to regulate the speech of those it places in its own counseling program. In Watts v. Florida International University, 495 F.3d 1289 (11th Cir. 2007), a state university required that students in its Master of Social Work program participate in a counseling practicum much like ASU's. Watts recommended to a patient in the practicum that the patient join a bereavement group at a church. Id. at 1292. The school terminated Watts for making this recommendation, stating that Watts had engaged in "inappropriate behavior related to patients, regarding religion," and that it was "the second such incident where personal boundaries have intruded into professional conduct." Id. Relying on a series of Supreme Court cases concerning the government's power, as an employer, to limit the speech of its employees when the employee speaks on a matter of private concern, which is what we found occurs when an employee provides "private counsel to a single patient within the confines of a counseling session," we rejected Watts's claim that the school's

25

actions violated his First Amendment free speech rights. Id. at 1293-94. Watts is essentially what this case would have been had ASU's officials' concerns arose from Keeton's conduct while she was participating in the practicum, rather than beforehand. But this difference does not limit Watts's applicability here, as the Supreme Court has held that it is not necessary for the government, as an employer, "to allow events to unfold to the extent that the disruption [to the program] is manifest before taking action." Connick v. Myers, 461 U.S. 138, 152 (1983). Because Keeton, like Watts, effectively would have been the school's employee in the clinical practicum, Watts provides further support for upholding ASU's officials' decision to prohibit Keeton from participating in the clinical practicum unless she completed the remediation plan and thereby demonstrated that she would not allow "personal boundaries [to] intrude[] into [her] professional conduct," Watts, 495 F.3d at 1292, as the ACA Code of Ethics and ASU's curriculum require.

2. Retaliation

Keeton next argues that, by imposing the remediation plan on her in response to her statements regarding her personal religious beliefs and her intent to impose those beliefs on clients, ASU's officials retaliated against her for exercising her First Amendment free speech rights. To establish a First

26

Amendment retaliation claim, the plaintiff must show "first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005). "In order to establish a causal connection, the plaintiff must show that the defendant was subjectively motivated to take the adverse action because of the protected speech." Castle v. Appalachian Technical College, 631 F.3d 1194, 1197 (11th Cir. 2011).

As explained in the prior section, the record shows that ASU's officials imposed the remediation plan, not because she expressed her personal religious views regarding homosexuality, but because she was unwilling to comply with the ACA Code of Ethics. That this unwillingness to abide by ASU's curriculum and her chosen profession's ethical standards initially became apparent through her writings and class discussions does not cloak it in First Amendment protection.

3. Compelled Speech

Finally, Keeton claims that ASU's officials sought to unconstitutionally compel her to express beliefs with which she disagrees. The case Keeton principally relies upon for this claim is West Virginia State Board of Education v. Barnette, 319 U.S. 624 (1943). In Barnette, the state required that all students in

public schools salute and pledge allegiance to the flag. Id. at 628. Noncompliance resulted in the student's expulsion, which then exposed the student to delinquency proceedings and the student's parents to criminal prosecution, a fine, and a jail term. Id. at 629. The Supreme Court struck down the scheme as violating the First Amendment, holding that "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." Id. at 642.

We find Barnette and its progeny inapplicable here for several reasons. First, unlike the plaintiff in Barnette, Keeton may choose not to attend ASU, and indeed may choose a different career. The Court in Barnette distinguished an earlier case on this ground, stating:

> This issue is not prejudiced by the Court's previous holding that where a State, without compelling attendance, extends college facilities to pupils who voluntarily enroll, it may prescribe military training as part of the course without offense to the Constitution. It was held that those who take advantage of its opportunities may not on ground of conscience refuse compliance with such conditions. Hamilton v. Regents, 293 U.S. 245 (1934). In the present case attendance is not optional.

Id. at 631-32. Likewise, ASU has conditioned participation in the clinical practicum and graduation on compliance with the ACA Code of Ethics, and Keeton, having voluntarily enrolled in the program, does not have a constitutional

28

right to refuse to comply with those conditions.

Another reason <u>Barnette</u> is inapplicable is that ASU is not forcing Keeton to profess a belief contrary to her own personal beliefs. Rather, it is compelling her to comply with the ACA Code of Ethics, which requires those who wish to be counselors to separate their personal beliefs from their work. When a GLBTQ client asks, for example, if his conduct is moral, students are taught to avoid giving advice, to explore the issue with the client, and to help the client determine for himself what the answer is for him. If a client determines for himself that his conduct is moral, the ACA Code of Ethics requires the counselor to affirm the client, which means that the counselor must respect the dignity of the client by accepting the client's response without judgment, not that the counselor must say that she <u>personally</u> believes that the client is correct. Thus, far from compelling Keeton to profess a belief or change her own beliefs about the morality of homosexuality, ASU instructs her not to express her personal beliefs regarding the client's moral values. This is the form of treatment that ASU and the ACA have determined best promotes client welfare, which, in their view, is the objective of secular counseling. Just as a medical school would be permitted to bar a student who refused to administer blood transfusions for religious reasons from participating in clinical rotations, so ASU may prohibit Keeton from participating

in its clinical practicum if she refuses to administer the treatment it has deemed appropriate.  Every profession has its own ethical codes and dictates. When someone voluntarily chooses to enter a profession, he or she must comply with its rules and ethical requirements.  Lawyers must present legal arguments on behalf of their clients, notwithstanding their personal views.  Judges must apply the law, even when they disagree with it.  So too counselors must refrain from imposing their moral and religious values on their clients.

Finally, the Supreme Court has hardly indicated an intention to limit a school's power to require its students to demonstrate whether they grasp a particular lesson.  A school must, for instance, be free to give a failing grade to a student who refuses to answer a test question for religious reasons, or who refuses to write a paper defending a position with which the student disagrees.  See Brown v. Li, 308 F.3d 939, 953 (9th Cir. 2002) (Garber, J.) ("[C]onsistent with the First Amendment[,] a teacher may require a student to write a paper from a particular viewpoint, even if it is a viewpoint with which the student disagrees, so long as the requirement serves a legitimate pedagogical purpose.").  No doubt, a law school would be permitted to require a student who expressed an intent to indiscriminately disclose her client's secrets or violate another of the state's bar rules to take extra ethics classes before letting the student participate in a school-

run clinic in which the student would be representing actual clients. These actions, like ASU's officials' imposition of the remediation plan, are the types of academic decisions that are subject to significant deference, not exacting constitutional scrutiny. See Ewing, 474 U.S. at 225-26.

For the foregoing reasons, we conclude that Keeton has not demonstrated a substantial likelihood that she will prevail on the merits of her free speech claims.

### B. Free Exercise Claims

Keeton also claims that ASU's officials' actions violated her right to the free exercise of religion. "[T]he threshold questions in analyzing a law challenged under the Free Exercise Clause are (1) is the law neutral, and (2) is the law of general applicability?" First Assembly of God of Naples, Florida, Inc. v. Collier Cnty., Fla., 20 F.3d 419, 423 (11th Cir. 1994). The neutrality inquiry asks whether "the object of a law is to infringe upon or restrict practices because of their religious motivation." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 533 (1993). The general applicability prong asks whether the government has "in a selective manner impose[d] burdens only on conduct motivated by religious belief." Id. at 543. "[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." Id.

31

at 531.  Rather, it needs only to survive rational basis review, see Combs v. Homer-Center School Dist., 540 F.3d 231, 242-43 (3d Cir. 2008), under which the it is presumed constitutional and the burden is on the plaintiff to prove that it is not rationally related to a legitimate government interest, Deen v. Egleston, 597 F.3d 1223, 1230-31 (11th Cir. 2010).

For many of the same reasons previously discussed, we conclude that ASU's curricular requirement that students comply with the ACA Code of Ethics, from which the remediation plan follows, is neutral and generally applicable. Nothing in the record indicates that the object of the curricular requirement is to infringe upon or restrict practices because of their religious motivation; rather, the evidence shows that, among other reasons, ASU adopted the ACA Code of Ethics to offer an accredited program.  Nor does the evidence indicate that ASU applies the curricular requirement in a selective manner that burdens only conduct motivated by religious belief; rather, the requirement applies equally to all students in the program.  It is ASU's general practice to craft remediation plans that target a student's particular curricular weakness, as it did here.  In seeking to evade the curricular requirement that she not impose her moral values on clients, Keeton is looking for preferential, not equal, treatment.  See CLS, 130 S.Ct. at 2995 n.27.

As the curricular requirement that students comply with the ACA Code of Ethics is neutral and generally applicable, it needs only to survive rational basis review. It easily satisfies this test, as it is rationally related to ASU's legitimate interest in offering an accredited counseling program. Thus, Keeton is unlikely to prevail on the merits of her claim that ASU violated her free exercise rights by requiring her to comply with the ACA Code of Ethics.

## IV. Conclusion

Because Keeton failed to satisfy the first requirement for a preliminary injunction—establishing a substantial likelihood of success on the merits—with respect to her free speech and free exercise claims, the district court did not abuse its discretion in denying her motion for a preliminary injunction.

**AFFIRMED.**

PRYOR, Circuit Judge, concurring

I join the panel opinion in full, but write separately to explain a few additional points about the context of this appeal.

The record before us contains some isolated evidence that officials of Augusta State University initially intended to engage in viewpoint discrimination against Jennifer Keeton. See Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 828, 115 S. Ct. 2510, 2516 (1995). In the initial remediation plan document, Augusta State identified three viewpoints that the university disfavors: (1) Keeton "voiced disagreement in several class discussions and in written assignments with the gay and lesbian 'lifestyle'"; (2) Keeton "stated in one paper that she believes GLBTQ lifestyles to be identity confusion"; and (3) Keeton "relayed her interest in conversion therapy for GLBTQ populations, and she . . . tried to convince other students to support and believe her views." Augusta State also explained in the initial remediation plan document why Keeton's statements conflict with the university's preferred viewpoints. Augusta State asserted that Keeton's "statements and actions are in direct conflict with the codes of ethics to which counselors and counselors-in-training are required to adhere." Augusta State maintained that "the psychological research about GLBTQ populations asserts that sexual orientation is not a lifestyle or choice, but a 'state of being.'"

34

Augusta State explained that "research in psychological peer-reviewed journals . . . reveals that conversion therapy is ineffective in changing [an] individual's sexual orientation from same-sex attractions to opposite-sex attractiveness." Augusta State concluded that Keeton's "lack of awareness of how her beliefs may negatively impact future clients is of great concern." Augusta State also explained that Keeton stated to professors that she held the disfavored belief that other people should share her moral and religious values:

> Statements made in your recent emails have confirmed the faculty's concern. In the June 14 email you said "My Christian moral views are not just about me. I think the Bible's teaching is true for all people, and it shows the right way to live." In the June 14 email, you indicated "I believe the Bible's teachings applies [sic] to all people on who they are and how they should act . . . from that I see that some behaviors are not moral or positive."
>
> These statements indicate that you think certain people should act in accordance with your moral values, and/or that your beliefs are in some way to [sic] superior to those of others. The belief that you possess a special knowledge about the way that other people should live their lives, and that others need to adopt a similar set of values contradicts the core principles of the American Counseling Association and American School Counselor Association Codes of Ethics, which define the roles and responsibilities of professional counselors.

These initial documents did not expressly tie the concerns of officials of Augusta State to Keeton's participation in a clinical program.

But the record, as a whole, establishes that the district court did not abuse its

discretion when it denied Keeton's motion for a preliminary injunction. At this stage, the record supports the finding that Augusta State imposed the remediation plan to prevent Keeton from violating the rules of the clinical program. Immediately after Keeton refused to adhere to the remediation plan, Augusta State refused to allow Keeton to enroll in that program. Augusta State did not demand that Keeton change her beliefs or refrain from all expression of those beliefs.

Augusta State has the authority to require all students enrolled in its clinical practicum, which involves one-on-one interaction with actual counselees, to adhere to a code of ethics. In Watts v. Florida International University, 495 F.3d 1289, 1291–94 (11th Cir. 2007), we ruled that a public university could terminate a graduate student from the clinical portion of a social work program when the student offered a patient advice about religion, in violation of the rules governing the program. The main distinction between Watts and Keeton's appeal is that the student in Watts was already enrolled in the clinical program when he engaged in speech that the university deemed impermissible, but this distinction is immaterial as a matter of law in the context of this appeal. When a student expresses her intent to violate the rules of a state-sponsored clinical program, the university may require her to provide reasonable assurances that she will comply with its requirements before the university permits the student to participate in the clinical

36

program.

But we have never ruled that a public university can discriminate against student speech based on the concern that the student might, in a variety of other circumstances, express views at odds with the preferred viewpoints of the university.  Our precedents roundly reject prior restraints in the public school setting.  As Judge Wisdom wrote over forty years ago, "When the restriction upon student expression takes the form of an attempt to predict in advance the content and consequences of that expression, it is tantamount to a prior restraint and carries a heavy presumption against its constitutionality."  Univ. of S. Miss. Chapter of the Miss. Civil Liberties Union v. Univ. of S. Miss., 452 F.2d 564, 566 (5th Cir. 1971).

A few decades ago, the prevailing view of the psychiatric profession maintained that homosexuality was a treatable mental disorder.  See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (2d ed. 1968).  As this record makes plain, the prevailing view changed. This shift in psychiatric orthodoxy occurred largely because professionals who had been taught that homosexuality was a disease of the mind, but who rejected that view, argued successfully that the psychiatric diagnostic criteria should be amended. See Herb Kutchins & Stuart A. Kirk, Making Us Crazy 55–77 (1997) (describing

professional efforts to remove homosexuality as a mental disorder from the DSM-II). This change in opinion would have taken much longer if public universities had been able to expel students who rejected the prevailing view and intended to argue that homosexuality was not a mental disease. As the First Amendment protected the professionals who successfully advocated against the then-prevailing view of the psychiatric profession, so too does it protect Keeton should she decide to advocate that those professionals got it wrong.

The decision of the Supreme Court in Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 108 S. Ct. 562 (1988), is instructive. In Hazelwood, the Supreme Court determined that public schools may regulate school-sponsored speech that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school when the regulation is reasonably related to legitimate pedagogical concerns. 484 U.S. at 271–73, 108 S. Ct. at 570–71. Hazelwood does not suggest that Augusta State can discriminate against Keeton's speech because it will someday confer a degree upon her. Nor does Hazelwood permit a public university to retaliate against student speech whenever it occurs in a classroom. And Hazelwood does not allow retaliation against disfavored speech that occurs outside the classroom.

Although we have concluded that Hazelwood allows a public university to

38

"limit in-school expressions which suggest the school's approval," Bishop v. Aranov, 926 F.2d 1066, 1074 (11th Cir. 1991), we have never held that Hazelwood permits a public university to punish a student's expressions of opinion when the speech is not school-sponsored or does not suggest the school's approval. As Justice Alito observed while serving on the Third Circuit, "Things that students express in class or in assignments when called upon to express their own views do not bear the imprimatur of the school, and do not represent the school's own speech." C.H. ex rel. Z.H. v. Oliva, 226 F.3d 198, 214 (3d Cir. 2000) (Alito, J., dissenting) (internal quotation marks and citations omitted). "The proposition that schools do not endorse everything that they fail to censor is not complicated." Id. (internal quotation marks and citation omitted). Permitting broad regulation of student speech would be fundamentally at odds with the Supreme Court's command that "the college classroom with its surrounding environs is peculiarly the marketplace of ideas[.]" Healy v. James, 408 U.S. 169, 180, 92 S. Ct. 2338, 2346 (1972). We must keep in mind that "[t]he First Amendment . . . does not tolerate laws that cast a pall of orthodoxy over the classroom." Keyishian v. Bd. of Regents of Univ. of the State of N.Y., 385 U.S. 589, 603, 87 S. Ct. 675, 683 (1967).

Although federal courts owe no deference to universities when considering

whether a public university has exceeded constitutional constraints, Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez, --- U.S. ----, 130 S. Ct. 2971, 2987 (2010), we may not act as "ersatz deans or educators" by second-guessing regular academic methods of a public university. Bishop, 926 F.3d at 1075. "Cognizant that judges lack the on-the-ground expertise and experience of school administrators . . . [the Supreme Court has] cautioned courts in various contexts to resist 'substitut[ing] their own notions of sound educational policy for those of the school authorities which they review.'" Martinez, --- U.S. ----, 130 S. Ct. at 2988 (quoting Bd. of Ed. Of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 206, 102 S. Ct. 3034, 3051 (1982)). In matters of instruction and academic programs, federal judges must instead exercise restraint. Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 225–26, 106 S. Ct. 507, 513–14 (1985) ("Considerations of profound importance counsel restrained judicial review of the substance of academic decisions.").