[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-15240
_____

D.C. Docket No. 6:15-cv-00785-GAP-TBS

JANE DOE I,
JANE DOE II, et al.,

Plaintiffs,

MELISSA MILWARD,
ELYSE UGALDE, et al.,

Plaintiffs - Appellants,

versus

VALENCIA COLLEGE BOARD OF TRUSTEES,
in its official capacity,

Defendant,

LINDA SHAHEEN,
in her individual capacity,
BARBARA BALL,
in her individual capacity, et al.,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(October 4, 2016)

Before MARCUS and WILIAM PRYOR, Circuit Judges, and LAWSON,[*] District Judge.

WILLIAM PRYOR, Circuit Judge:

This appeal requires us to decide two issues: whether student speech that objects to the pedagogy of officials of a public college is "school-sponsored" expression under the First Amendment and whether an invasive ultrasound constitutes a "search" under the Fourth Amendment when performed for instructional reasons instead of investigative or administrative reasons. After several employees of Valencia College encouraged students to submit voluntarily to invasive ultrasounds performed by peers as part of a training program in sonography, some students objected. The employees then allegedly retaliated against the objecting students and successfully pressured two students to undergo the procedure. The students filed a complaint against the employees, which the district court dismissed for failure to state a claim. Because the district court erroneously classified the students' speech as school-sponsored expression and the

---

[*] Honorable Hugh Lawson, United States District Judge for the Middle District of Georgia, sitting by designation.

2

district court erroneously ruled that the ultrasound was not a search under the Fourth Amendment, we vacate the order dismissing the complaint and remand for further proceedings.

## I. BACKGROUND

When reviewing an appeal from a dismissal for failure to state a claim, we accept all allegations in the complaint as true. The students—Melissa Milward, Elyse Ugalde, and Ashley Rose—are former sonography students at Valencia College, a public college in Florida. The sonography program at Valencia is highly competitive and admits only 12 students per year. At the time, Barbara Ball was the chair of the program, Linda Shaheen was the clinical and laboratory coordinator, Maureen Bugnacki was a laboratory technician, and Suda Amodt was a laboratory and physics instructor. Each employee is a defendant in this appeal. All three students quit the program because the employees had their students perform transvaginal ultrasounds on each other and retaliated against the students for objecting.

A transvaginal ultrasound is used to detect problems with a woman's fertility, among other uses. It requires inserting a probe into the vagina, which allows the sonographer to see the woman's cervix and other reproductive organs. Receiving a transvaginal ultrasound is invasive and can be embarrassing. One of the students who would perform the procedure was male. The probe is also rather

3

large and can be painful for some women. It requires heavy lubrication, and sometimes the technician will stimulate the patient to help insert the probe.

Although the transvaginal ultrasounds were purportedly voluntary, in practice, the employees required students to perform them on each other. At the orientation for new students, a second-year student explained that the employees believed female students should undergo the procedure to become better technicians. If students refused, the employees would browbeat them and threaten their academic standing as well as their future careers. For example, when Milward and Ugalde complained to Ball about the ultrasounds, Ball told them they could find another school if they did not wish to be probed. When Milward complained to Shaheen about the ultrasounds, Shaheen responded that she would suffer academically and professionally if she refused to participate. The employees also threatened to lower the students' grades, and Bugnacki threatened to blacklist them at the local hospitals. Milward and Ugalde eventually submitted to the transvaginal ultrasounds. But Rose refused. As punishment, the employees did not allow Rose to watch the other students perform the ultrasounds. Amodt also threatened to bar Rose from a local hospital, gave Rose two failing grades, and yelled at Rose for an hour until she had a panic attack.

4

In May 2015, the students sued Ball, Shaheen, Bugnacki, Amodt, and the Board of Trustees of Valencia College. The Board is no longer a party. In their second amended complaint, the students allege that the employees violated their rights under the First and Fourth Amendments, 42 U.S.C. § 1983. Specifically, all three students allege that the employees retaliated against them for speaking out against the ultrasounds, and Milward and Ugalde also allege that the ultrasounds were an unconstitutional search. The students also allege that the employees conspired to violate their rights, 42 U.S.C. § 1983. The students seek compensatory damages, punitive damages, injunctive relief, and fees and costs. Shortly after the students filed their complaint, the employees ended peer-to-peer transvaginal ultrasounds.

The district court dismissed the students' complaint for failure to state a claim. The district court rejected the students' claim under the First Amendment because they had not engaged in protected speech. The district court concluded that under the test from *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), the students' speech enjoyed only limited protection and could be overridden by the employees' legitimate pedagogical choices. The district court also rejected the students' claim under the Fourth Amendment because the transvaginal ultrasounds were not a search. A search must be "motivated by investigatory or administrative

5

purposes," according to the district court, and the transvaginal ultrasounds were done for educational purposes only. *Milward v. Shaheen*, 148 F. Supp. 3d 1341, 1348 (M.D. Fla. 2015). Because the district court ruled that the employees did not violate the students' constitutional rights, the district court also rejected the conspiracy claim and held that the employees were entitled to qualified immunity. *Id*.

## II. STANDARD OF REVIEW

"We review *de novo* the dismissal of a complaint for failure to state a claim, and we accept all plausible factual allegations in the complaint." *Evanto v. Fed. Nat'l Mortg. Ass'n*, 814 F.3d 1295, 1297 (11th Cir. 2016).

## III. DISCUSSION

We divide our discussion into two parts. First, we explain why the district court erroneously classified the students' speech as "school-sponsored" expression. Second, we explain why the district court erroneously concluded that an invasive ultrasound conducted for instructional reasons is not a search under the Fourth Amendment.

*A. The District Court Erroneously Classified the Speech As School-Sponsored Expression.*

The students argue that the employees violated the First Amendment by retaliating against them for speaking out against the transvaginal ultrasounds. "To

6

establish a First Amendment retaliation claim, the plaintiff must show 'first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech.'" *Keeton v. Anderson-Wiley*, 664 F.3d 865, 878 (11th Cir. 2011) (quoting *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005)). The employees argue, and the district court agreed, that the students' speech is not protected under the First Amendment.

The parties primarily disagree about how to classify the students' speech. In evaluating student speech, we consider "the special characteristics of the school environment." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). We identify four classifications of student speech in the classroom: "vulgar expression, pure student expression, government expression, and school-sponsored expression." *Bannon v. Sch. Dist. of Palm Beach Cty.*, 387 F.3d 1208, 1213 (11th Cir. 2004). Pure student expression is "student expression that merely happens to occur on the school premises." *Id*. It is governed by the standard in *Tinker*. That is, "schools must tolerate such expression unless they can reasonably forecast that the expression will lead to 'substantial disruption of or material interference with school activities.'" *Id*. (quoting *Tinker*, 393 U.S. at 514). School-sponsored

expression, by contrast, includes only expressive activities that meet three qualifications: 1) "students, parents, and members of the public might reasonably perceive [the activity] to bear the imprimatur of the school"; 2) the faculty supervises the activity; and 3) the activity, by design, imparts knowledge or skills to students or audiences. *Hazelwood*, 484 U.S. at 271. It is governed by the standard in *Hazelwood*: "schools may censor [it] so long as their actions are reasonably related to legitimate pedagogical concerns." *Bannon*, 387 F.3d at 1213–14.

The district court assessed the students' speech under *Hazelwood*, but that framework does not apply to this appeal. The speech at issue—the students' complaints to the employees about the transvaginal ultrasounds—is not school-sponsored expression. Private complaints from individual students do not "bear the imprimatur of the school." *See id.* at 1214. The employees rely on our decision in *Keeton*, which applied *Hazelwood* to a college student who wanted to counsel students that "it was not okay to be gay" during the college's training program for future counselors. 664 F.3d at 868. But counseling by a student-counselor during a college's training program bears the imprimatur of the school. *See id.* at 875 ("[T]he clinical practicum, which Keeton seeks to participate in, is a 'school-sponsored expressive activit[y],' as those who receive counseling in the program

8

and members of the general public 'might reasonably perceive [it] to bear the imprimatur of the school.'" (second and third alterations in original) (quoting *Hazelwood*, 484 U.S. at 271)). Additionally, a student-counselor's participation in a college training program is both "supervised by faculty members and designed to impart particular knowledge or skills." *Id.* In this appeal, the students' objections did not bear the imprimatur of the school, were not supervised by faculty, and were not designed to impart particular knowledge or skills.

Instead of assessing the students' speech as school-sponsored expression under *Hazelwood*, the district court should have evaluated it as pure student expression under *Tinker* because it "merely happen[ed] to occur on the school premises." *Bannon*, 387 F.3d at 1213. Accordingly, the employees must tolerate the students' complaints about the transvaginal ultrasounds "unless they can reasonably forecast that the expression will lead to 'substantial disruption of or material interference with school activities.'" *Id.* (quoting *Tinker*, 393 U.S. at 514). We vacate the order dismissing the students' claim under the First Amendment.

*B. The Ultrasounds Were Searches Under the Fourth Amendment.*

Milward and Ugalde argue that the transvaginal ultrasounds were an unconstitutional search under the Fourth Amendment. The employees argue, and the district court agreed, that no search occurred because the transvaginal

9

ultrasounds had no "investigative" or "administrative" purpose. The district court erred.

Inserting a probe into a woman's vagina is plainly a search when performed by the government. Where the government physically intrudes on a subject enumerated within the Fourth Amendment, such as a person, a search "has undoubtedly occurred." *United States v. Jones*, 132 S. Ct. 945, 950–51 & n.3 (2012). The Supreme Court has long recognized that compelled blood and urine tests implicate the Fourth Amendment. *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 616 (1989) (citing *Winston v. Lee*, 470 U.S. 753, 760 (1985); *Schmerber v. California*, 384 U.S. 757, 767–68 (1966)). Even under the broader test that a "search" is "any governmental act that violates a reasonable expectation of privacy," *O'Rourke v. Hayes*, 378 F.3d 1201, 1207 (11th Cir. 2004), each ultrasound clearly constituted a search. "[I]t is obvious" that the "compelled intrusio[n] into the body . . . infringes an expectation of privacy that society is prepared to recognize as reasonable." *Skinner*, 489 U.S. at 616 (internal quotation marks and citations omitted).

Although the employees did not conduct the transvaginal ultrasounds to discover violations of the law, the word "search" in the Fourth Amendment does

10

not contain a purpose requirement. The Supreme Court explained in *Soldal v. Cook County* why such a requirement would be anomalous:

> [T]he *reason* why an officer might enter a house or effectuate a seizure is *wholly irrelevant* to the threshold question whether the [Fourth] Amendment applies. What matters is the intrusion on the people's security from governmental interference. Therefore, the right against unreasonable seizures would be no less transgressed if the seizure of the house was undertaken to collect evidence, verify compliance with a housing regulation, effect an eviction by the police, *or on a whim, for no reason at all*. As we have observed on more than one occasion, it would be "anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior."

506 U.S. 56, 69 (1992) (emphases added) (quoting *Camara v. Mun. Court of San Francisco*, 387 U.S. 523, 530 (1967)).

The employees, like the district court, rely on the decision of the Ninth Circuit in *United States v. Attson*, 900 F.2d 1427 (9th Cir. 1990), but *Attson* is not good law. In *Attson*, a drunk driver crashed his car, killing one of his passengers. *Id*. at 1429. At the hospital, a doctor (who was employed by the federal government) took a sample of the driver's blood. *Id*. The doctor took the sample "for *medical* reasons alone": he wanted to ensure the driver was not too intoxicated to receive pain medication. *Id*. The driver consented to having his blood taken for medical purposes, but not police purposes. *Id*. The driver was eventually charged with manslaughter, and a grand jury subpoenaed the results of the blood test. *Id.*

11

When the driver filed a motion to suppress, the Ninth Circuit concluded that no "search" had occurred because the doctor was not "motivated by investigatory or administrative purposes." *Id*. at 1430–31, 1433. This reasoning flies in the face of *Soldal*, which the Supreme Court decided two years after *Attson*. And the reasoning in *Attson* contradicts our decision in *Lenz v. Winburn*, where we held that a "search" occurred when a guardian ad litem went through a closet to find clothes for a child that she was removing from the home. 51 F.3d 1540 (11th Cir. 1995). Citing *Soldal*, we expressly rejected the argument that a search must be "motivated by an investigative purpose." *Id.* at 1547. We held that "even though [the guardian] looked through [the child's] clothes out of concern for [the child's] comfort and not as part of any investigation, the search falls within the ambit of the Fourth Amendment." *Id*. at 1548. And later, the Ninth Circuit held, without citing *Attson*, that people "have a legitimate expectation of privacy in being free from an unwanted medical examination, whether or not that examination entails any particularly intrusive procedures." *Yin v. California*, 95 F.3d 864, 871 (9th Cir. 1996).

We acknowledge that several of our sister circuits require an investigative or administrative purpose even after *Soldal* in decisions involving "peeping Toms," but we find their reasoning unpersuasive. *See, e.g.*, *Doe v. Luzerne Cty.*, 660 F.3d

12

169, 179 (3d Cir. 2011) (concluding no search occurred when a male police officer filmed a female police officer in the shower); *Poe v. Leonard*, 282 F.3d 123, 137 (2d Cir. 2002) (similar). For instance, the decision in *Luzerne County* did not even cite *Soldal*. The decision in *Poe* did, but it confined *Soldal* to disputes arising from an investigation by the government as an employer or in the course of an official performing a traditional governmental function. *Poe*, 282 F.3d at 136–37. In support, the court in *Poe* relied on five Supreme Court decisions, including *Soldal*, that it interpreted as arising in those circumstances. *Id.* We think the decision in *Poe* reads *Soldal* too narrowly. The Supreme Court did not suggest its holding was limited to instances involving a government employer-driven investigation or an officer performing a traditional governmental function. Instead, it held broadly, "What matters is the intrusion on the people's security from governmental interference." *Soldal*, 506 U.S. at 69. Moreover, even if we found these decisions persuasive, we must follow our decisions until they are overruled by the Supreme Court or an en banc decision of this Court. *United States v. Vega-Castillo*, 540 F.3d 1235, 1236 (11th Cir. 2008). The holding of *Lenz* squarely forecloses the ruling by the district court. We vacate the order dismissing the students' claim under the Fourth Amendment.

## IV. CONCLUSION

We **VACATE** the dismissal of the students' complaint and **REMAND** for further proceedings.